# SCHOOL DISTRICT OF ABINGTON TOWNSHIP, PENNSYLVANIA, ET AL. *v.* SCHEMPP ET AL.

No. 142.   Argued February 27–28, 1963.—Decided June 17, 1963.*

*John D. Killian III,* Deputy Attorney General of Pennsylvania, and *Philip H. Ward III* argued the cause for appellants in No. 142.   With them on the brief were *David Stahl,* Attorney General of Pennsylvania, *Percival R. Rieder* and *C. Brewster Rhoads.*

*Henry W. Sawyer III* argued the cause for appellees in No. 142.   With him on the brief was *Wayland H. Elsbree.*

*Leonard J. Kerpelman* argued the cause and filed a brief for petitioners in No. 119.

*Francis B. Burch* and *George W. Baker, Jr.* argued the cause for respondents in No. 119.   With them on the brief were *Nelson B. Seidman* and *Philip Z. Altfeld.*

---

*Together with No. 119, *Murray et al.* v. *Curlett et al., Constituting the Board of School Commissioners of Baltimore City,* on certiorari to the Court of Appeals of Maryland, argued February 27. 1963.

*Thomas B. Finan,* Attorney General of Maryland, argued the cause for the State of Maryland, as *amicus curiae,* urging affirmance in No. 119. With him on the brief were *James P. Garland* and *Robert F. Sweeney,* Assistant Attorneys General of Maryland. *Richmond M. Flowers,* Attorney General of Alabama, *Robert Pickrell,* Attorney General of Arizona, *Bruce Bennett,* Attorney General of Arkansas, *Richard W. Ervin,* Attorney General of Florida, *Eugene Cook,* Attorney General of Georgia, *Allan G. Shepard,* Attorney General of Idaho, *William M. Ferguson,* Attorney General of Kansas, *Jack P. F. Gremillion,* Attorney General of Louisiana, *Frank E. Hancock,* Attorney General of Maine, *Joe T. Patterson,* Attorney General of Mississippi, *William Maynard,* Attorney General of New Hampshire, *Arthur J. Sills,* Attorney General of New Jersey, *Earl E. Hartley,* Attorney General of New Mexico, *Thomas Wade Bruton,* Attorney General of North Carolina, *J. Joseph Nugent,* Attorney General of Rhode Island, *Daniel R. McLeod,* Attorney General of South Carolina, *Frank R. Farrar,* Attorney General of South Dakota, and *George F. McCanless,* Attorney General of Tennessee, joined in the brief on behalf of their respective States, as *amici curiae.*

Briefs of *amici curiae,* urging affirmance in No. 142 and reversal in No. 119, were filed by *Morris B. Abram, Edwin J. Lukas, Burnett Roth, Arnold Forster, Paul Hartman, Theodore Leskes* and *Sol Rabkin* for the American Jewish Committee et al.; by *Leo Pfeffer, Lewis H. Weinstein, Albert Wald, Shad Polier, Samuel Lawrence Brennglass* and *Theodore R. Mann* for the Synagogue Council of America et al.; and by *Herbert A. Wolff, Leo Rosen, Morris L. Ernst* and *Nancy F. Wechsler* for the American Ethical Union.

MR. JUSTICE CLARK delivered the opinion of the Court.

Once again we are called upon to consider the scope of the provision of the First Amendment to the United States Constitution which declares that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." These companion cases present the issues in the context of state action requiring that schools begin each day with readings from the Bible. While raising the basic questions under slightly different factual situations, the cases permit of joint treatment. In light of the history of the First Amendment and of our cases interpreting and applying its requirements, we hold that the practices at issue and the laws requiring them are unconstitutional under the Establishment Clause, as applied to the States through the Fourteenth Amendment.

## I.

*The Facts in Each Case:* No. 142. The Commonwealth of Pennsylvania by law, 24 Pa. Stat. § 15–1516, as amended, Pub. Law 1928 (Supp. 1960) Dec. 17, 1959, requires that "At least ten verses from the Holy Bible shall be read, without comment, at the opening of each public school on each school day. Any child shall be excused from such Bible reading, or attending such Bible reading, upon the written request of his parent or guardian." The Schempp family, husband and wife and two of their three children, brought suit to enjoin enforcement of the statute, contending that their rights under the Fourteenth Amendment to the Constitution of the United States are, have been, and will continue to be violated unless this statute be declared unconstitutional as violative of these provisions of the First Amendment. They sought to enjoin the appellant school district, wherein the Schempp children attend school, and its officers and the

Superintendent of Public Instruction of the Common-wealth from continuing to conduct such readings and reci-tation of the Lord's Prayer in the public schools of the district pursuant to the statute. A three-judge statutory District Court for the Eastern District of Pennsylvania held that the statute is violative of the Establishment Clause of the First Amendment as applied to the States by the Due Process Clause of the Fourteenth Amendment and directed that appropriate injunctive relief issue. 201 F. Supp. 815.[1] On appeal by the District, its officials and the Superintendent, under 28 U. S. C. § 1253, we noted probable jurisdiction. 371 U. S. 807.

The appellees Edward Lewis Schempp, his wife Sidney, and their children, Roger and Donna, are of the Unitarian faith and are members of the Unitarian Church in Germantown, Philadelphia, Pennsylvania, where they, as well as another son, Ellory, regularly attend religious services. The latter was originally a party but having graduated from the school system *pendente lite* was vol-untarily dismissed from the action. The other children attend the Abington Senior High School, which is a public school operated by appellant district.

On each school day at the Abington Senior High School between 8:15 and 8:30 a. m., while the pupils are attend-ing their home rooms or advisory sections, opening exer-

---

[1] The action was brought in 1958, prior to the 1959 amendment of § 15–1516 authorizing a child's nonattendance at the exercises upon parental request. The three-judge court held the statute and the practices complained of unconstitutional under both the Estab-lishment Clause and the Free Exercise Clause. 177 F. Supp. 398. Pending appeal to this Court by the school district, the statute was so amended, and we vacated the judgment and remanded for further proceedings. 364 U. S. 298. The same three-judge court granted appellees' motion to amend the pleadings, 195 F. Supp. 518, held a hearing on the amended pleadings and rendered the judgment, 201 F. Supp. 815, from which appeal is now taken.

cises are conducted pursuant to the statute. The exercises are broadcast into each room in the school building through an intercommunications system and are conducted under the supervision of a teacher by students attending the school's radio and television workshop. Selected students from this course gather each morning in the school's workshop studio for the exercises, which include readings by one of the students of 10 verses of the Holy Bible, broadcast to each room in the building. This is followed by the recitation of the Lord's Prayer, likewise over the intercommunications system, but also by the studer, in the various classrooms, who are asked to stand and join in repeating the prayer in unison. The exercises are closed with the flag salute and such pertinent announcements as are of interest to the students. Participation in the opening exercises, as directed by the statute, is voluntary. The student reading the verses from the Bible may select the passages and read from any version he chooses, although the only copies furnished by the school are the King James version, copies of which were circulated to each teacher by the school district. During the period in which the exercises have been conducted the King James, the Douay and the Revised Standard versions of the Bible have been used, as well as the Jewish Holy Scriptures. There are no prefatory statements, no questions asked or solicited, no comments or explanations made and no interpretations given at or during the exercises. The students and parents are advised that the student may absent himself from the classroom or, should he elect to remain, not participate in the exercises.

It appears from the record that in schools not having an intercommunications system the Bible reading and the recitation of the Lord's Prayer were conducted by the

home-room teacher,[2] who chose the text of the verses and read them herself or had students read them in rotation or by volunteers. This was followed by a standing recitation of the Lord's Prayer, together with the Pledge of Allegiance to the Flag by the class in unison and a closing announcement of routine school items of interest.

At the first trial Edward Schempp and the children testified as to specific religious doctrines purveyed by a literal reading of the Bible "which were contrary to the religious beliefs which they held and to their familial teaching." 177 F. Supp. 398, 400. The children testified that all of the doctrines to which they referred were read to them at various times as part of the exercises. Edward Schempp testified at the second trial that he had considered having Roger and Donna excused from attendance at the exercises but decided against it for several reasons, including his belief that the children's relationships with their teachers and classmates would be adversely affected.[3]

---

[2] The statute as amended imposes no penalty upon a teacher refusing to obey its mandate. However, it remains to be seen whether one refusing could have his contract of employment terminated for "wilful violation of the school laws." 24 Pa. Stat. (Supp. 1960) § 11–1122.

[3] The trial court summarized his testimony as follows:

"Edward Schempp, the children's father, testified that after careful consideration he had decided that he should not have Roger or Donna excused from attendance at these morning ceremonies. Among his reasons were the following. He said that he thought his children would be 'labeled as "odd balls"' before their teachers and classmates every school day; that children, like Roger's and Donna's classmates, were liable 'to lump all particular religious difference[s] or religious objections [together] as "atheism"' and that today the word 'atheism' is often connected with 'atheistic communism,' and has 'very bad' connotations, such as 'un-American' or 'anti-Red,' with overtones of possible immorality. Mr. Schempp pointed out that due to the events of the morning exercises following in rapid succession, the Bible reading, the Lord's Prayer, the Flag Salute, and

Expert testimony was introduced by both appellants and appellees at the first trial, which testimony was summarized by the trial court as follows:

"Dr. Solomon Grayzel testified that there were marked differences between the Jewish Holy Scriptures and the Christian Holy Bible, the most obvious of which was the absence of the New Testament in the Jewish Holy Scriptures. Dr. Grayzel testified that portions of the New Testament were offensive to Jewish tradition and that, from the standpoint of Jewish faith, the concept of Jesus Christ as the Son of God was 'practically blasphemous.' He cited instances in the New Testament which, assertedly, were not only sectarian in nature but tended to bring the Jews into ridicule or scorn. Dr. Grayzel gave as his expert opinion that such material from the New Testament could be explained to Jewish children in such a way as to do no harm to them. But if portions of the New Testament were read without explanation, they could be, and in his specific experience with children Dr. Grayzel observed, had been, psychologically harmful to the child and had caused a divisive force within the social media of the school.

"Dr. Grayzel also testified that there was significant difference in attitude with regard to the respective Books of the Jewish and Christian Religions in that Judaism attaches no special significance to the reading of the Bible *per se* and that the Jewish Holy Scriptures are source materials to be studied. But Dr. Grayzel did state that many portions of the New,

---

the announcements, excusing his children from the Bible reading would mean that probably they would miss hearing the announcements so important to children. He testified also that if Roger and Donna were excused from Bible reading they would have to stand in the hall outside their 'homeroom' and that this carried with it the imputation of punishment for bad conduct." 201 F. Supp., at 818.

as well as of the Old, Testament contained passages of great literary and moral value.

"Dr. Luther A. Weigle, an expert witness for the defense, testified in some detail as to the reasons for and the methods employed in developing the King James and the Revised Standard Versions of the Bible. On direct examination, Dr. Weigle stated that the Bible was non-sectarian. He later stated that the phrase 'non-sectarian' meant to him non-sectarian within the Christian faiths. Dr. Weigle stated that his definition of the Holy Bible would include the Jewish Holy Scriptures, but also stated that the 'Holy Bible' would not be complete without the New Testament. He stated that the New Testament 'conveyed the message of Christians.' In his opinion, reading of the Holy Scriptures to the exclusion of the New Testament would be a sectarian practice. Dr. Weigle stated that the Bible was of great moral, historical and literary value. This is conceded by all the parties and is also the view of the court." 177 F. Supp. 398, 401–402.

The trial court, in striking down the practices and the statute requiring them, made specific findings of fact that the children's attendance at Abington Senior High School is compulsory and that the practice of reading 10 verses from the Bible is also compelled by law. It also found that:

"The reading of the verses, even without comment, possesses a devotional and religious character and constitutes in effect a religious observance. The devotional and religious nature of the morning exercises is made all the more apparent by the fact that the Bible reading is followed immediately by a recital in unison by the pupils of the Lord's Prayer. The fact that some pupils, or theoretically all pupils, might be excused from attendance at the exercises

does not mitigate the obligatory nature of the ceremony for . . . Section 1516 . . . unequivocally requires the exercises to be held every school day in every school in the Commonwealth. The exercises are held in the school buildings and perforce are conducted by and under the authority of the local school authorities and during school sessions. Since the statute requires the reading of the 'Holy Bible,' a Christian document, the practice . . . prefers the Christian religion. The record demonstrates that it was the intention of . . . the Commonwealth . . . to introduce a religious ceremony into the public schools of the Commonwealth." 201 F. Supp., at 819.

No. 119. In 1905 the Board of School Commissioners of Baltimore City adopted a rule pursuant to Art. 77, § 202 of the Annotated Code of Maryland. The rule provided for the holding of opening exercises in the schools of the city, consisting primarily of the "reading, without comment, of a chapter in the Holy Bible and/or the use of the Lord's Prayer." The petitioners, Mrs. Madalyn Murray and her son, William J. Murray III, are both professed atheists. Following unsuccessful attempts to have the respondent school board rescind the rule, this suit was filed for mandamus to compel its rescission and cancellation. It was alleged that William was a student in a public school of the city and Mrs. Murray, his mother, was a taxpayer therein; that it was the practice under the rule to have a reading on each school morning from the King James version of the Bible; that at petitioners' insistence the rule was amended [4] to permit children to

---

[4] The rule as amended provides as follows:

"Opening Exercises. Each school, either collectively or in classes, shall be opened by the reading, without comment, of a chapter in the Holy Bible and/or the use of the Lord's Prayer. The Douay version may be used by those pupils who prefer it. Appropriate

be excused from the exercise on request of the parent and that William had been excused pursuànt thereto; that nevertheless the rule as amended was in violation of the petitioners' rights "to freedom of religion under the First and Fourteenth Amendments" and in violation of "the principle of separation between church and state, contained therein. . . ." The petition particularized the petitioners' atheistic beliefs and stated that the rule, as practiced, violàted their rights

> "in that it threatens their religious liberty by placing a premium on belief as against non-belief and subjects their freedom of conscience to the rule of the majority; it pronounces belief in God as the source of all moral and spiritual values, equating these values with religious values, and thereby renders sinister, alien and suspect the beliefs and ideals of your Petitioners; promoting doubt and question of their morality, good citizenship and good faith."

The respondents demurred and the trial court, recognizing that the demurrer admitted all facts well pleaded, sustained it without leave to amend. The Maryland Court of Appeals affirmed, the majority of four justices holding the exercise not in violation of the First and Fourteenth Amendments, with three justices dissenting. 228 Md. 239, 179 A. 2d 698. We granted certiorari. 371 U. S. 809.

## II.

It is true that religion has been closely identified with our history and government. As we said in *Engel* v. *Vitale,* 370 U. S. 421, 434 (1962), "The history of man is inseparable from the history of religion. And . . . since

---

patriotic exercises should be held as a part of the general opening exercise of the school or class. Any child shall be excused from participating in the opening exercises or from attending the opening exercises upon the written request of his parent or guardian."

the beginning of that history many people have devoutly believed that 'More things are wrought by prayer than this world dreams of.'" In *Zorach* v. *Clauson,* 343 U. S. 306, 313 (1952), we gave specific recognition to the proposition that "[w]e are a religious people whose institutions presuppose a Supreme Being." The fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself. This background is evidenced today in our public life through the continuance in our oaths of office from the Presidency to the Alderman of the final supplication, "So help me God." Likewise each House of the Congress provides through its Chaplain an opening prayer, and the sessions of this Court are declared open by the crier in a short ceremony, the final phrase of which invokes the grace of God. Again, there are such manifestations in our military forces, where those of our citizens who are under the restrictions of military service wish to engage in voluntary worship. Indeed, only last year an official survey of the country indicated that 64% of our people have church membership, Bureau of the Census, U. S. Department of Commerce, Statistical Abstract of the United States (83d ed. 1962), 48, while less than 3% profess no religion whatever. *Id.,* at p. 46. It can be truly said, therefore, that today, as in the beginning, our national life reflects a religious people who, in the words of Madison, are "earnestly praying, as . . . in duty bound, that the Supreme Lawgiver of the Universe . . . guide them into every measure which may be worthy of his [blessing . . . .]" Memorial and Remonstrance Against Religious Assessments, quoted in *Everson* v. *Board of Education,* 330 U. S. 1, 71–72 (1947) (Appendix to dissenting opinion of Rutledge, J.).

This is not to say, however, that religion has been so identified with our history and government that religious freedom is not likewise as strongly imbedded in our public and private life. Nothing but the most telling of personal experiences in religious persecution suffered by our forebears, see *Everson* v. *Board of Education, supra,* at 8–11, could have planted our belief in liberty of religious opinion any more deeply in our heritage. It is true that this liberty frequently was not realized by the colonists, but this is readily accountable by their close ties to the Mother Country.[5] However, the views of Madison and Jefferson, preceded by Roger Williams,[6] came to be incorporated not only in the Federal Constitution but likewise in those of most of our States. This freedom to worship was indispensable in a country whose people came from the four quarters of the earth and brought with them a diversity of religious opinion. Today authorities list 83 separate religious bodies, each with membership exceeding 50,000, existing among our people, as well as innumerable smaller groups. Bureau of the Census, *op. cit., supra,* at 46–47.

## III.

Almost a hundred years ago in *Minor* v. *Board of Education of Cincinnati,*[7] Judge Alphonso Taft, father

---

[5] There were established churches in at least eight of the original colonies, and various degrees of religious support in others as late as the Revolutionary War. See *Engel* v. *Vitale, supra,* at 428, n. 10.

[6] "There goes many a ship to sea, with many hundred souls in one ship, whose weal and woe is common, and is a true picture of a commonwealth, or human combination, or society. It hath fallen out sometimes, that both Papists and Protestants, Jews and Turks, may be embarked in one ship; upon which supposal, I affirm that all the liberty of conscience I ever pleaded for, turns upon these two hinges, that none of the Papists, Protestants, Jews, or Turks be forced to come to the ship's prayers or worship, nor compelled from their own particular prayers or worship, if they practice any."

[7] Superior Court of Cincinnati, February 1870. The opinion is not reported but is published under the title, The Bible in the Com-

of the revered Chief Justice, in an unpublished opinion stated the ideal of our people as to religious freedom as one of

"absolute equality before the law, of all religious opinions and sects . . . .

.        .        .        .        .

"The government is neutral, and, while protecting all, it prefers none, and it *disparages* none."

Before examining this "neutral" position in which the Establishment and Free Exercise Clauses of the First Amendment place our Government it is well that we discuss the reach of the Amendment under the cases of this Court.

First, this Court has decisively settled that the First Amendment's mandate that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof" has been made wholly applicable to the States by the Fourteenth Amendment. Twenty-three years ago in *Cantwell* v. *Connecticut,* 310 U. S. 296, 303 (1940), this Court, through Mr. Justice Roberts, said:

"The fundamental concept of liberty embodied in that [Fourteenth] Amendment embraces the liberties guaranteed by the First Amendment. The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amend-

---

mon Schools (Cincinnati: Robert Clarke & Co. 1870). Judge Taft's views, expressed in dissent, prevailed on appeal. See *Board of Education of Cincinnati* v. *Minor,* 23 Ohio St. 211, 253 (1872), in which the Ohio Supreme Court held that:

"The great bulk of human affairs and human interests is left by any free government to individual enterprise and individual action. Religion is eminently one of these interests, lying outside the true and legitimate province of government."

ment has rendered the legislatures of the states as incompetent as Congress to enact such laws. . . ."[8]

In a series of cases since *Cantwell* the Court has repeatedly reaffirmed that doctrine, and we do so now. *Murdock* v. *Pennsylvania,* 319 U. S. 105, 108 (1943); *Everson* v. *Board of Education, supra; Illinois ex rel. McCollum* v. *Board of Education,* 333 U. S. 203, 210–211 (1948); *Zorach* v. *Clauson, supra; McGowan* v. *Maryland,* 366 U. S. 420 (1961); *Torcaso* v. *Watkins,* 367 U. S. 488 (1961); and *Engel* v. *Vitale, supra.*

Second, this Court has rejected unequivocally the contention that the Establishment Clause forbids only governmental preference of one religion over another. Almost 20 years ago in *Everson, supra,* at 15, the Court said that "[n]either a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another." And Mr. Justice Jackson, dissenting, agreed:

> "There is no answer to the proposition . . . that the effect of the religious freedom Amendment to our Constitution was to take every form of propagation of religion out of the realm of things which could directly or indirectly be made public business and thereby be supported in whole or in part at taxpayers' expense. . . . This freedom was first in the Bill of Rights because it was first in the forefathers' minds; it was set forth in absolute terms, and its strength is its rigidity." *Id.,* at 26.

---

[8] Application to the States of other clauses of the First Amendment obtained even before *Cantwell.* Almost 40 years ago in the opinion of the Court in *Gitlow* v. *New York,* 268 U. S. 652, 666 (1925), Mr. Justice Sanford said: "For present purposes we may and do assume that freedom of speech and of the press—which are protected by the First Amendment from abridgment by Congress—are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States."

Further, Mr. Justice Rutledge, joined by Justices Frankfurter, Jackson and Burton, declared:

> "The [First] Amendment's purpose was not to strike merely at the official establishment of a single sect, creed or religion, outlawing only a formal relation such as had prevailed in England and some of the colonies. Necessarily it was to uproot all such relationships. But the object was broader than separating church and state in this narrow sense. It was to create a complete and permanent separation of the spheres of religious activity and civil authority by comprehensively forbidding every form of public aid or support for religion." *Id.*, at 31–32.

The same conclusion has been firmly maintained ever since that time, see *Illinois ex rel. McCollum, supra,* at pp. 210–211; *McGowan* v. *Maryland, supra,* at 442–443; *Torcaso* v. *Watkins, supra,* at 492–493, 495; and we reaffirm it now.

While none of the parties to either of these cases has questioned these basic conclusions of the Court, both of which have been long established, recognized and consistently reaffirmed, others continue to question their history, logic and efficacy. Such contentions, in the light of the consistent interpretation in cases of this Court, seem entirely untenable and of value only as academic exercises.

## IV.

The interrelationship of the Establishment and the Free Exercise Clauses was first touched upon by Mr. Justice Roberts for the Court in *Cantwell* v. *Connecticut, supra,* at 303–304, where it was said that their "inhibition of legislation" had

> "a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of

conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be."

A half dozen years later in *Everson* v. *Board of Education, supra,* at 14–15, this Court, through MR. JUSTICE BLACK, stated that the "scope of the First Amendment . . . . was designed forever to suppress" the establishment of religion or the prohibition of the free exercise thereof. In short, the Court held that the Amendment

"requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions than it is to favor them." *Id.,* at 18.

And Mr. Justice Jackson, in dissent, declared that public schools are organized

"on the premise that secular education can be isolated from all religious teaching so that the school can inculcate all needed temporal knowledge and also maintain a strict and lofty neutrality as to religion. The assumption is that after the individual has been instructed in worldly wisdom he will be better fitted to choose his religion." *Id.,* at 23–24.

Moreover, all of the four dissenters, speaking through Mr. Justice Rutledge, agreed that

"Our constitutional policy . . . does not deny the value or the necessity for religious training, teaching or observance. Rather it secures their free exercise. But to that end it does deny that the state can undertake or sustain them in any form or degree. For this

reason the sphere of religious activity, as distinguished from the secular intellectual liberties, has been given the twofold protection and,.as the state cannot forbid, neither can it perform or aid in performing the religious function. The dual prohibition makes that function altogether private." *Id.*, at 52.

Only one year later the Court was asked to reconsider and repudiate the doctrine of these cases in *McCollum* v. *Board of Education*. It was argued that "historically the First Amendment was intended to forbid only government preference of one religion over another . : . . In addition they ask that we distinguish or overrule our holding in the *Everson* case that the Fourteenth Amendment made the 'establishment of religion' clause of the First Amendment applicable as a prohibition against the States." 333 U. S., at 211. The Court, with Mr. Justice Reed alone dissenting, was unable to "accept either of these contentions." *Ibid.* Mr. Justice Frankfurter, joined by Justices Jackson, Rutledge and Burton, wrote a very comprehensive and scholarly concurrence in which he said that "[s]eparation is a requirement to abstain from fusing functions of Government and of religious sects, not merely to treat them all equally." *Id.*, at 227. Continuing, he stated that:

"the Constitution . . . prohibited the Government common to all from becoming embroiled, however innocently, in the destructive religious conflicts of which the history of even this country records some dark pages." *Id.*, at 228.

In 1952 in *Zorach* v. *Clauson, supra,* Mr. Justice Douglas for the Court reiterated:

"There cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated. And so far as interference with the 'free exercise' of religion and an

'establishment' of religion are concerned, the separation must be complete and unequivocal. The First Amendment within the scope of its coverage permits no exception; the prohibition is absolute. The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter." 343 U. S., at 312.

And then in 1961 in *McGowan* v. *Maryland* and in *Torcaso* v. *Watkins* each of these cases was discussed and approved. CHIEF JUSTICE WARREN in *McGowan*, for a unanimous Court on this point, said:

"But, the First Amendment, in its final form, did not simply bar a congressional enactment *establishing a church;* it forbade all laws *respecting an establishment of religion.* Thus, this Court has given the Amendment a 'broad interpretation . . . in the light of its history and the evils it was designed forever to suppress. . . .'" 366 U. S., at 441–442.

And MR. JUSTICE BLACK for the Court in *Torcaso,* without dissent but with Justices Frankfurter and HARLAN concurring in the result, used this language:

"We repeat and again reaffirm that neither a State nor the Federal Government can constitutionally force a person 'to profess a belief or disbelief in any religion.' Neither can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs." 367 U. S., at 495.

Finally, in *Engel* v. *Vitale,* only last year, these principles were so universally recognized that the Court, with-

out the citation of a single case and over the sole dissent of MR. JUSTICE STEWART, reaffirmed them. The Court found the 22-word prayer used in "New York's program of daily classroom invocation of God's blessings as prescribed in the Regents' prayer . . . [to. be] a religious activity." 370 U. S., at 424. It held that "it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government." *Id.*, at 425. In discussing the reach of the Establishment and Free Exercise Clauses of the First Amendment the Court said:

> "Although these two clauses may in certain instances overlap, they forbid two quite different kinds of governmental · encroachment upon religious freedom. The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce non-observing individuals or not. This is not to say, of course, that laws officially prescribing a particular form of religious worship do not involve coercion of such individuals. When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Id.*, at 430–431.

And in further elaboration the Court found that the "first and most immediate purpose [of the Establishment Clause] rested on the belief that a union of government and religion tends to destroy government and to degrade religion." *Id.*, at 431. When government, the Court said, allies itself with one particular form of religion, the

inevitable result is that it incurs "the hatred, disrespect and even contempt of those who held contrary beliefs." *Ibid.*

## V.

The wholesome "neutrality" of which this Court's cases speak thus stems from a recognition of the teachings of history that powerful sects or groups might bring about a fusion of governmental and religious functions or a concert or dependency of one upon the other to the end that official support of the State or Federal Government would be placed behind the tenets of one or of all orthodoxies. This the Establishment Clause prohibits. And a further reason for neutrality is found in the Free Exercise Clause, which recognizes the value of religious training, teaching and observance and, more particularly, the right of every person to freely choose his own course with reference thereto, free of any compulsion from the state. This the Free Exercise Clause guarantees. Thus, as we have seen, the two clauses may overlap. As we have indicated, the Establishment Clause has been directly considered by this Court eight times in the past score of years and, with only one Justice dissenting on the point, it has consistently held that the clause withdrew all legislative power respecting religious belief or the expression thereof. The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion. *Everson v. Board of Education, supra; McGowan v. Maryland, supra,* at 442. The Free Exercise Clause, likewise considered many times here, withdraws from legislative power, state and federal, the exertion of any restraint on the free exer-

cise of religion. Its purpose is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority. Hence it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion. The distinction between the two clauses is apparent—a violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended.

Applying the Establishment Clause principles to the cases at bar we find that the States are requiring the selection and reading at the opening of the school day of verses from the Holy Bible and the recitation of the Lord's Prayer by the students in unison. These exercises are prescribed as part of the curricular activities of students who are required by law to attend school. They are held in the school buildings under the supervision and with the participation of teachers employed in those schools. None of these factors, other than compulsory school attendance, was present in the program upheld in *Zorach* v. *Clauson*. The trial court in No. 142 has found that such an opening exercise is a religious ceremony and was intended by the State to be so. We agree with the trial court's finding as to the religious character of the exercises. Given that finding, the exercises and the law requiring them are in violation of the Establishment Clause.

There is no such specific finding as to the religious character of the exercises in No. 119, and the State contends (as does the State in No. 142) that the program is an effort to extend its benefits to all public school children without regard to their religious belief. Included within its secular purposes, it says, are the promotion of moral values, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature. The case came up

224

on demurrer, of course, to a petition which alleged that the uniform practice under the rule had been to read from the King James version of the Bible and that the exercise was sectarian. The short answer, therefore, is that the religious character of the exercise was admitted by the State. But even if its purpose is not strictly religious, it is sought to be accomplished through readings, without comment, from the Bible. Surely the place of the Bible as an instrument of religion cannot be gainsaid, and the State's recognition of the pervading religious character of the ceremony is evident from the rule's specific permission of the alternative use of the Catholic Douay version as well as the recent amendment permitting nonattendance at the exercises. None of these factors is consistent with the contention that the Bible is here used either as an instrument for nonreligious moral inspiration or as a reference for the teaching of secular subjects.

The conclusion follows that in both cases the laws require religious exercises and such exercises are being conducted in direct violation of the rights of the appellees and petitioners.[9] Nor are these required exercises mitigated by the fact that individual students may absent

[9] It goes without saying that the laws and practices involved here can be challenged only by persons having standing to complain. But the requirements for standing to challenge state action under the Establishment Clause, unlike those relating to the Free Exercise Clause, do not include proof that particular religious freedoms are infringed. *McGowan* v. *Maryland, supra,* at 429–430. The parties here are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed. These interests surely suffice to give the parties standing to complain. See *Engel* v. *Vitale, supra.* Cf. *McCollum* v. *Board of Education, supra; Everson* v. *Board of Education, supra.* Compare *Doremus* v. *Board of Education,* 342 U. S. 429 (1952), which involved the same substantive issues presented here. The appeal was there dismissed upon the graduation of the school child involved and because of the appellants' failure to establish standing as taxpayers.

themselves upon parental request, for that fact furnishes no defense to a claim of unconstitutionality under the Establishment Clause. See *Engel* v. *Vitale, supra,* at 430. Further, it is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment. The breach of neutrality that is today a trickling stream may all too soon become a raging torrent and, in the words of Madison, "it is proper to take alarm at the first experiment on our liberties." Memorial and Remonstrance Against Religious Assessments, quoted in *Everson, supra,* at 65.

It is insisted that unless these religious exercises are permitted a "religion of secularism" is established in the schools. We agree of course that the State may not establish a "religion of secularism" in the sense of affirmatively opposing or showing hostility to religion, thus "preferring those who believe in no religion over those who do believe." *Zorach* v. *Clauson, supra,* at 314. We do not agree, however, that this decision in any sense has that effect. In addition, it might well be said that one's education is not complete without a study of comparative religion or the history of religion and its relationship to the advancement of civilization. It certainly may be said that the Bible is worthy of study for its literary and historic qualities. Nothing we have said here indicates that such study of the Bible or of religion, when presented objectively as part of a secular program of education, may not be effected consistently with the First Amendment. But the exercises here do not fall into those categories. They are religious exercises, required by the States in violation of the command of the First Amendment that the Government maintain strict neutrality, neither aiding nor opposing religion.

Finally, we cannot accept that the concept of neutrality, which does not permit a State to require a religious exercise even with the consent of the majority of those

affected, collides with the majority's right to free exercise of religion.[10]   While the Free Exercise Clause clearly prohibits the use of state action to deny the rights of free exercise to *anyone,* it has never meant that a majority could use the machinery of the State to practice its beliefs.   Such a contention was effectively answered by Mr. Justice Jackson for the Court in *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624, 638 (1943):

> "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.   One's right to . . . freedom of worship . . . and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections."

The place of religion in our society is an exalted one, achieved through a long tradition of reliance on the home, the church and the inviolable citadel of the individual heart and mind.   We have come to recognize through bitter experience that it is not within the power of government to invade that citadel, whether its purpose or effect be to aid or oppose, to advance or retard.   In the relationship between man and religion, the State is firmly committed to a position of neutrality.   Though the application of that rule requires interpretation of a delicate sort, the rule itself is clearly and concisely stated in the words of the First Amendment.   Applying that rule to the facts of these cases, we affirm the judgment in No. 142.

---

[10] We are not of course presented with and therefore do not pass upon a situation such as military service, where the Government regulates the temporal and geographic environment of individuals to a point that, unless it permits voluntary religious services to be conducted with the use of government facilities, military personnel would be unable to engage in the practice of their faiths.

In No. 119, the judgment is reversed and the cause remanded to the Maryland Court of Appeals for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS, concurring.

I join the opinion of the Court and add a few words in explanation.

While the Free Exercise Clause of the First Amendment is written in terms of what the State may not require of the individual, the Establishment Clause, serving the same goal of individual religious freedom, is written in different terms.

Establishment of a religion can be achieved in several ways. The church and state can be one; the church may control the state or the state may control the church; or the relationship may take one of several possible forms of a working arrangement between the two bodies.[1] Under all of these arrangements the church typically has a place in the state's budget, and church law usually governs such matters as baptism, marriage, divorce and separation, at least for its members and sometimes for the entire body politic.[2] Education, too, is usually high on the priority

---

[1] See Bates, Religious Liberty: An Inquiry (1945), 9–14, 239–252; Cobb, Religious Liberty in America (1902), 1–2, cc. IV, V; Gledhill, Pakistan, The Development of its Laws and Constitution (8 British Commonwealth, 1957), 11–15; Keller, Church and State on the European Continent (1936), c. 2; Pfeffer, Church, State, and Freedom (1953), c. 2; I Stokes, Church and State in the United States (1950), 151–169.

[2] See III Stokes, *op. cit., supra,* n. 1, 42–67; Bates, *op. cit., supra,* n. 1, 9–11, 58–59, 98, 245; Gledhill, *op. cit., supra,* n. 1, 128, 192, 205, 208; Rackman, Israel's Emerging Constitution (1955), 120–134; Drinan, Religious Freedom in Israel, America (Apr. 6, 1963), 456–457.

list of church interests.[3] In the past schools were often
made the exclusive responsibility of the church. Today
in some state-church countries the state runs the public
schools, but compulsory religious exercises are often re-
quired of some or all students. Thus, under the agree-
ment Franco made with the Holy See when he came to
power in Spain, "The Church regained its place in the
national budget. It insists on baptizing all children and
has made the catechism obligatory in state schools." [4]

The vice of all such arrangements under the Establish-
ment Clause is that the state is lending its assistance to
a church's efforts to gain and keep adherents. Under the
First Amendment it is strictly a matter for the individual
and his church as to what church he will belong to and
how much support, in the way of belief, time, activity or
money, he will give to it. "This pure Religious Liberty"
"declared . . . [all forms of church-state relationships]
and their fundamental idea to be oppressions of conscience
and abridgments of that liberty which God and nature
had conferred on every living soul." [5]

In these cases we have no coercive religious exercise
aimed at making the students conform. The prayers an-
nounced are not compulsory, though some may think they
have that indirect effect because the nonconformist stu-
dent may be induced to participate for fear of being
called an "oddball." But that coercion, if it be present,

[3] See II Stokes, *op. cit., supra*, n. 1, 488–548; Boles, The Bible,
Religion, and the Public Schools (2d ed. 1963), 4–10; Rackman, *op.
cit., supra*, n. 2, at 136–141; O'Brien, *The Engel* Case From A Swiss
Perspective, 61 Mich. L. Rev. 1069; Freund, Muslim Education in
West Pakistan, 56 Religious Education 31.

[4] Bates, *op. cit., supra*, n. 1, at 18; Pfeffer, *op. cit., supra*, n. 1, at
28–31; Thomas, The Balance of Forces in Spain, 41 Foreign Affairs
208, 210.

[5] Cobb, *op. cit., supra*, n. 1, at 2.

has not been shown; so the vices of the present regimes are different.

These regimes violate the Establishment Clause in two different ways. In each case the State is conducting a religious exercise; and, as the Court holds, that cannot be done without violating the "neutrality" required of the State by the balance of power between individual, church and state that has been struck by the First Amendment. But the Establishment Clause is not limited to precluding the State itself from conducting religious exercises. It also forbids the State to employ its facilities or funds in a way that gives any church, or all churches, greater strength in our society than it would have by relying on its members alone. Thus, the present regimes must fall under that clause for the additional reason that public funds, though small in amount, are being used to promote a religious exercise. Through the mechanism of the State, all of the people are being required to finance a religious exercise that only some of the people want and that violates the sensibilities of others.

*The most effective way to establish any institution is to finance it; and this truth is reflected in the appeals by church groups for public funds to finance their religious schools.*[6] Financing a church either in its strictly religious activities or in its other activities is equally unconstitutional, as I understand the Establishment Clause. Budgets for one activity may be technically separable from budgets for others.[7] But the institution is an inseparable whole, a living organism, which is strengthened in proselytizing when it is strengthened in any department by contributions from other than its own members.

---

[6] See II Stokes, *op. cit., supra,* n. 1, at 681–695.

[7] See Accountants' Handbook (4th ed. 1956) 4.8–4.15.

Such contributions may not be made by the State even in a minor degree without violating the Establishment Clause. It is not the amount of public funds expended; as this case illustrates, it is the use to which public funds are put that is controlling. For the First Amendment does not say that some forms of establishment are allowed; it says that "no law respecting an establishment of religion" shall be made. What may not be done directly may not be done indirectly lest the Establishment Clause become a mockery.

Mr. Justice Brennan, concurring.

Almost a century and a half ago, John Marshall, in *M'Culloch* v. *Maryland,* enjoined: ". . . we must never forget, that it is *a constitution* we are expounding." 4 Wheat. 316, 407. The Court's historic duty to expound the meaning of the Constitution has encountered few issues more intricate or more demanding than that of the relationship between religion and the public schools. Since undoubtedly we are "a religious people whose institutions presuppose a Supreme Being," *Zorach* v. *Clauson,* 343 U. S. 306, 313, deep feelings are aroused when aspects of that relationship are claimed to violate the injunction of the First Amendment that government may make "no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." Americans regard the public schools as a most vital civic institution for the preservation of a democratic system of government. It is therefore understandable that the constitutional prohibitions encounter their severest test when they are sought to be applied in the school classroom. Nevertheless it is this Court's inescapable duty to declare whether exercises in the public schools of the States, such as those of Pennsylvania and Maryland questioned here, are involvements of religion in public institutions of a kind which offends the First and Fourteenth Amendments.

When John Locke ventured in 1689, "I esteem it above all things necessary to distinguish exactly the business of civil government from that of religion and to settle the just bounds that lie between the one and the other," [1] he anticipated the necessity which would be thought by the Framers to require adoption of a First Amendment, but not the difficulty that would be experienced in defining those "just bounds." The fact is that the line which separates the secular from the sectarian in American life is elusive. The difficulty of defining the boundary with precision inheres in a paradox central to our scheme of liberty. While our institutions reflect a firm conviction that we are a religious people, those institutions by solemn constitutional injunction may not officially involve religion in such a way as to prefer, discriminate against, or oppress, a particular sect or religion. Equally the Constitution enjoins those involvements of religious with secular institutions which (a) serve the essentially religious activities of religious institutions; (b) employ the organs of government for essentially religious purposes; or (c) use essentially religious means to serve governmental ends where secular means would suffice. The constitutional mandate expresses a deliberate and considered judgment that such matters are to be left to the conscience of the citizen, and declares as a basic postulate of the relation between the citizen and his government that "the rights of conscience are, in their nature, of peculiar delicacy, and will little bear the gentlest touch of governmental hand . . . ." [2]

I join fully in the opinion and the judgment of the Court. I see no escape from the conclusion that the exer-

---

[1] Locke, A Letter Concerning Toleration, in 35 Great Books of the Western World (Hutchins ed. 1952), 2.

[2] Representative Daniel Carroll of Maryland during debate upon the proposed Bill of Rights in the First Congress, August 15, 1789, I Annals of Cong. 730.

cises called in question in these two cases violate the constitutional mandate. The reasons we gave only last Term in *Engel* v. *Vitale*, 370 U. S. 421, for finding in the New York Regents' prayer an impermissible establishment of religion, compel the same judgment of the practices at bar. The involvement of the secular with the religious is no less intimate here; and it is constitutionally irrelevant that the State has not composed the material for the inspirational exercises presently involved. It should be unnecessary to observe that our holding does not declare that the First Amendment manifests hostility to the practice or teaching of religion, but only applies prohibitions incorporated in the Bill of Rights in recognition of historic needs shared by Church and State alike. While it is my view that not every involvement of religion in public life is unconstitutional, I consider the exercises at bar a form of involvement which clearly violates the Establishment Clause.

The importance of the issue and the deep conviction with which views on both sides are held seem to me to justify detailing at some length my reasons for joining the Court's judgment and opinion.

## I.

The First Amendment forbids both the abridgment of the free exercise of religion and the enactment of laws "respecting an establishment of religion." The two clauses, although distinct in their objectives and their applicability, emerged together from a common panorama of history. The inclusion of both restraints upon the power of Congress to legislate concerning religious matters shows unmistakably that the Framers of the First Amendment were not content to rest the protection of religious liberty exclusively upon either clause. "In assuring the free exercise of religion," Mr. Justice Frankfurter has said,

"the Framers of the First Amendment were sensitive to the then recent history of those persecutions and impositions of civil disability with which sectarian majorities in virtually all of the Colonies had visited deviation in the matter of conscience. This protection of unpopular creeds, however, was not to be the full extent of the Amendment's guarantee of freedom from governmental intrusion in matters of faith. The battle in Virginia, hardly four years won, where James Madison had led the forces of disestablishment in successful opposition to Patrick Henry's proposed Assessment Bill levying a general tax for the support of Christian teachers, was a vital and compelling memory in 1789." *McGowan* v. *Maryland*, 366 U. S. 420, 464–465.

It is true that the Framers' immediate concern was to prevent the setting up of an official federal church of the kind which England and some of the Colonies had long supported. But nothing in the text of the Establishment Clause supports the view that the prevention of the setting up of an official church was meant to be the full extent of the prohibitions against official involvements in religion. It has rightly been said:

"If the framers of the Amendment meant to prohibit Congress merely from the establishment of a 'church,' one may properly wonder why they didn't so state. That the words *church* and *religion* were regarded as synonymous seems highly improbable, particularly in view of the fact that the contemporary state constitutional provisions dealing with the subject of establishment used definite phrases such as 'religious sect,' 'sect,' or 'denomination.' . . . With such specific wording in contemporary state constitutions, why was not a similar wording adopted for the First Amendment if its framers intended to prohibit nothing more than what the States were pro-

hibiting?"   Lardner, How Far Does the Constitution Separate Church and State? 45 Am. Pol. Sci. Rev. 110, 112 (1951).

Plainly, the Establishment Clause, in the contemplation of the Framers, "did not limit the constitutional proscription to any particular, dated form of state-supported theological venture." "What Virginia had long practiced, and what Madison, Jefferson and others fought to end, was the extension of civil government's support to religion in a manner which made the two in some degree interdependent, and thus threatened the freedom of each. The purpose of the Establishment Clause was to assure that the national legislature would not exert its power in the service of any purely religious end; that it would not, as Virginia and virtually all of the Colonies had done, make of religion, as religion, an object of legislation. . . .   The Establishment Clause withdrew from the sphere of legitimate legislative concern and competence a specific, but comprehensive, area of human conduct: man's belief or disbelief in the verity of some transcendental idea and man's expression in action of that belief or disbelief." *McGowan* v. *Maryland, supra,* at 465–466 (opinion of Frankfurter, J.).

In sum, the history which our prior decisions have summoned to aid interpretation of the Establishment Clause permits little doubt that its prohibition was designed comprehensively to prevent those official involvements of religion which would tend to foster or discourage religious worship or belief.

But an awareness of history and an appreciation of the aims of the Founding Fathers do not always resolve concrete problems.   The specific question before us has, for example, aroused vigorous dispute whether the architects of the First Amendment—James Madison and Thomas Jefferson particularly—understood the prohibition against any "law respecting an establishment of

religion" to reach devotional exercises in the public schools.[3] It may be that Jefferson and Madison would have held such exercises to be permissible—although even in Jefferson's case serious doubt is suggested by his admonition against "putting the Bible and Testament into the hands of the children at an age when their judgments are not sufficiently matured for religious inquiries . . . ." [4] But

---

[3] See Healey, Jefferson on Religion in Public Education (1962); Boles, The Bible, Religion, and the Public Schools (1961), 16–21; Butts, The American Tradition in Religion and Education (1950), 119–130; Cahn, On Government and Prayer, 37 N. Y. U. L. Rev. 981 (1962); Costanzo, Thomas Jefferson, Religious Education and Public Law, 8 J. Pub. Law 81 (1959); Comment, The Supreme Court, the First Amendment, and Religion in the Public Schools, 63 Col. L. Rev. 73, 79–83 (1963).

[4] Jefferson's caveat was in full:

"Instead, therefore, of putting the Bible and Testament into the hands of the children at an age when their judgments are not sufficiently matured for religious inquiries, their memories may here be stored with the most useful facts from Grecian, Roman, European and American history." 2 Writings of Thomas Jefferson (Memorial ed. 1903), 204.

Compare Jefferson's letter to his nephew, Peter Carr, when the latter was about to begin the study of law, in which Jefferson outlined a suggested course of private study of religion since "[y]our reason is now mature enough to examine this object." Letter to Peter Carr, August 10, 1787, in Padover, The Complete Jefferson (1943), 1058. Jefferson seems to have opposed sectarian instruction at any level of public education, see Healey, Jefferson on Religion in Public Education (1962), 206–210, 256, 264–265. The absence of any mention of religious instruction in the projected elementary and secondary schools contrasts significantly with Jefferson's quite explicit proposals concerning religious instruction at the University of Virginia. His draft for "A Bill for the More General Diffusion of Knowledge" in 1779, for example, outlined in some detail the secular curriculum for the public schools, while avoiding any references to religious studies. See Padover, supra, at 1048–1054. The later draft of an "Act for Establishing Elementary Schools" which Jefferson submitted to the Virginia General Assembly in 1817 provided that "no religious reading, instruction or exercise, shall be prescribed or practiced incon-

I doubt that their view, even if perfectly clear one way or the other, would supply a dispositive answer to the question presented by these cases. A more fruitful inquiry, it seems to me, is whether the practices here challenged threaten those consequences which the Framers deeply feared; whether, in short, they tend to promote that type of interdependence between religion and state which the First Amendment was designed to prevent[5] Our task is to translate "the majestic generalities of the Bill of Rights, conceived as part of the pattern of liberal government in the eighteenth century, into concrete restraints on officials

sistent with the tenets of any religious sect or denomination." Padover, *supra*, at 1076. Reliance upon Jefferson's apparent willingness to permit certain religious instruction at the University seems, therefore, to lend little support to such instruction in the elementary and secondary schools. Compare, *e. g.*, Corwin, A Constitution of Powers in a Secular State (1951), 104–106; Costanzo, Thomas Jefferson, Religious Education and Public Law, 8 J. Pub. Law 81, 100–106 (1959).

[5] Cf. Mr. Justice Rutledge's observations in *Everson* v. *Board of Education,* 330 U. S. 1, 53–54 (dissenting opinion). See also Fellman, Separation of Church and State in the United States: A Summary View, 1950 Wis. L. Rev. 427, 428–429; Rosenfield, Separation of Church and State in the Public Schools, 22 U. of Pitt. L. Rev. 561, 569 (1961), MacKinnon, Freedom?—or Toleration? The Problem of Church and State in the United States, [1959] Pub. Law 374. One author has suggested these reasons for cautious application of the history of the Constitution's religious guarantees to contemporary problems:

"First, the brevity of Congressional debate and the lack of writings on the question by the framers make any historical argument inconclusive and open to serious question. Second, the amendment was designed to outlaw practices which had existed before its writing, but there is no authoritative declaration of the specific practices at which it was aimed. And third, most of the modern religious-freedom cases turn on issues which were at most academic in 1789 and perhaps did not exist at all. Public education was almost nonexistent in 1789, and the question of religious education in public schools may not have been foreseen." Beth, The American Theory of Church and State (1958), 88.

dealing with the problems of the twentieth century . . . ."
*West Virginia State Board of Education* v. *Barnette*, 319
U. S. 624, 639.

A too literal quest for the advice of the Founding
Fathers upon the issues of these cases seems to me futile
and misdirected for several reasons: First, on our precise
problem the historical record is at best ambiguous, and
statements can readily be found to support either side of
the proposition.   The ambiguity of history is understand-
able if we recall the nature of the problems uppermost
in the thinking of the statesmen who fashioned the reli-
gious guarantees; they were concerned with far more
flagrant intrusions of government into the realm of reli-
gion than any that our century has witnessed.[6]   While it is
clear to me that the Framers meant the Establishment
Clause to prohibit more than the creation of an estab-
lished federal church such as existed in England, I have
no doubt that, in their preoccupation with the imminent
question of established churches, they gave no dis-

---

[6] See generally, for discussion of the early efforts for disestablish-
ment of the established colonial churches, and of the conditions
against which the proponents of separation of church and state con-
tended, Sweet, The Story of Religion in America (1950), c. XIII;
Cobb, The Rise of Religious Liberty in America (1902), c. IX;
Eckenrode, Separation of Church and State in Virginia (1910);
Brant, James Madison—The Nationalist, 1780–1787 (1948), c. XXII;
Bowers, The Young Jefferson (1945), 193–199; Butts, The American
Tradition in Religion and Education (1950), c. II; Kruse, The Histori-
cal Meaning and Judicial Construction of the Establishment of Reli-
gion Clause of the First Amendment, 2 Washburn L. J. 65, 79–83
(1962).   Compare also Alexander Hamilton's conception of "the char-
acteristic difference between a tolerated and established religion" and
his grounds of opposition to the latter, in his remarks on the Quebec
Bill in 1775, 2 Works of Alexander Hamilton (Hamilton ed. 1850),
133–138.   Compare, for the view that contemporary evidence re-
veals a design of the Framers to forbid not only formal establish-
ment of churches, but various forms of incidental aid to or support
of religion, Lardner, How Far Does the Constitution Separate Church
and State? 45 Am. Pol. Sci. Rev. 110, 112–115 (1951).

tinct consideration to the particular question whether the clause also forbade devotional exercises in public institutions.

Second, the structure of American education has greatly changed since the First Amendment was adopted. In the context of our modern emphasis upon public education available to all citizens, any views of the eighteenth century as to whether the exercises at bar are an "establishment" offer little aid to decision. Education, as the Framers knew it, was in the main confined to private schools more often than not under strictly sectarian supervision. Only gradually did control of education pass largely to public officials.[7] It would, therefore,

---

[7] The origins of the modern movement for free state-supported education cannot be fixed with precision. In England, the Levellers unavailingly urged in their platform of 1649 the establishment of free primary education for all, or at least for boys. See Brailsford, The Levellers and the English Revolution (1961), 534. In the North American Colonies, education was almost without exception under private sponsorship and supervision, frequently under control of the dominant Protestant sects. This condition prevailed after the Revolution and into the first quarter of the nineteenth century. See generally Mason, Moral Values and Secular Education (1950), c. II; Thayer, The Role of the School in American Society (1960), c. X; Greene, Religion and the State: The Making and Testing of an American Tradition (1941), 120–122. Thus, Virginia's colonial Governor Berkeley exclaimed in 1671: "I thank God there are no free schools nor printing, and I hope we shall not have them these hundred years; for learning has brought disobedience, and heresy, and sects into the world . . . ." (Emphasis deleted.) Bates, Religious Liberty: An Inquiry (1945), 327.

The exclusively private control of American education did not, however, quite survive Berkeley's expectations. Benjamin Franklin's proposals in 1749 for a Philadelphia Academy heralded the dawn of publicly supported secondary education, although the proposal did not bear immediate fruit. See Johnson and Yost, Separation of Church and State in the United States (1948), 26–27. Jefferson's elaborate plans for a public school system in Virginia came to naught after the defeat in 1796 of his proposed Elementary School Bill, which found little favor among the wealthier legislators. See Bowers, The

hardly be significant if the fact was that the nearly universal devotional exercises in the schools of the young Republic did not provoke criticism; even today religious ceremonies in church-supported private schools are constitutionally unobjectionable.

Young Jefferson (1945), 182–186. It was not until the 1820's and 1830's, under the impetus of Jacksonian democracy, that a system of public education really took root in the United States. See 1 Beard, The Rise of American Civilization (1937), 810–818. One force behind the development of secular public schools may have been a growing dissatisfaction with the tightly sectarian control over private education, see Harner, Religion's Place in General Education (1949), 29–30. Yet the burgeoning public school systems did not immediately supplant the old sectarian and private institutions; Alexis de Tocqueville, for example, remarked after his tour of the Eastern States in 1831 that "[a]lmost all education is entrusted to the clergy." 1 Democracy in America (Bradley ed. 1945) 309, n. 4. And compare Lord Bryce's observations, a half century later, on the still largely denominational character of American higher education, 2 The American Commonwealth (1933), 734–735.

Efforts to keep the public schools of the early nineteenth century free from sectarian influence were of two kinds. One took the form of constitutional provisions and statutes adopted by a number of States forbidding appropriations from the public treasury for the support of religious instruction in any manner. See Moehlman, The Wall of Separation Between Church and State (1951), 132–135; Lardner, How Far Does the Constitution Separate Church and State? 45 Am. Pol. Sci. Rev. 110, 122 (1951). The other took the form of measures directed against the use of sectarian reading and teaching materials in the schools. The texts used in the earliest public schools had been largely taken over from the private academies, and retained a strongly religious character and content. See Nichols, Religion and American Democracy (1959), 64–80; Kinney, Church and State, The Struggle for Separation in New Hampshire, 1630–1900 (1955), 150–153. In 1827, however, Massachusetts enacted a statute providing that school boards might not thereafter "direct any school books to be purchased or used, in any of the schools . . . which are calculated to favour any particular religious sect or tenet." 2 Stokes, Church and State in the United States (1950), 53. For further discussion of the background of the Massachusetts law and difficulties in its early application, see Dunn,

Third, our religious composition makes us a vastly more diverse people than were our forefathers. They knew differences chiefly among Protestant sects. Today the Nation is far more heterogeneous religiously, including as it does substantial minorities not only of Catholics and Jews but as well of those who worship according to no version of the Bible and those who worship no God at all.[8]

---

What Happened to Religious Education? (1958), c. IV. As other States followed the example of Massachusetts, the use of sectarian texts was in time as widely prohibited as the appropriation of public funds for religious instruction.

Concerning the evolution of the American public school systems free of sectarian influence, compare Mr. Justice Frankfurter's account:

"It is pertinent to remind that the establishment of this principle of Separation in the field of education was not due to any decline in the religious beliefs of the people. Horace Mann was a devout Christian, and the deep religious feeling of James Madison is stamped upon the Remonstrance. The secular public school did not imply indifference to the basic role of religion in the life of the people, nor rejection of religious education as a means of fostering it. The claims of religion were not minimized by refusing to make the public schools agencies for their assertion. The non-sectarian or secular public school was the means of reconciling freedom in general with religious freedom. The sharp confinement of the public schools to secular education was a recognition of the need of a democratic society to educate its children, insofar as the State undertook to do so, in an atmosphere free from pressures in a realm in which pressures are most resisted and where conflicts are most easily and most bitterly engendered." *Illinois ex rel. McCollum* v. *Board of Education*, 333 U. S. 203, 216.

[8] The comparative religious homogeneity of the United States at the time the Bill of Rights was adopted has been considered in Haller, The Puritan Background of the First Amendment, in Read ed., The Constitution Reconsidered (1938), 131, 133–134; Beth, The American Theory of Church and State (1958), 74; Kinney, Church and State, The Struggle for Separation in New Hampshire, 1630–1900 (1955), 155–161. However, Madison suggested in the Fifty-first Federalist that the religious diversity which existed at the time of the Constitutional Convention constituted a source of strength for religious freedom, much as the multiplicity of economic and political interests enhanced the security of other civil rights. The Federalist (Cooke ed. 1961), 351–352.

See *Torcaso* v. *Watkins,* 367 U. S. 488, 495.   In the face of such profound changes, practices which may have been objectionable to no one in the time of Jefferson and Madison may today be highly offensive to many persons, the deeply devout and the nonbelievers alike.

Whatever Jefferson or Madison would have thought of Bible reading or the recital of the Lord's Prayer in what few public schools existed in their day, our use of the history of their time must limit itself to broad purposes, not specific practices.   By such a standard, I am persuaded, as is the Court, that the devotional exercises carried on in the Baltimore and Abington schools offend the First Amendment because they sufficiently threaten in our day those substantive evils the fear of which called forth the Establishment Clause of the First Amendment. It is *"a constitution* we are expounding," and our interpretation of the First Amendment must necessarily be responsive to the much more highly charged nature of religious questions in contemporary society.

Fourth, the American experiment in free public education available to all children has been guided in large measure by the dramatic evolution of the religious diversity among the population which our public schools serve. The interaction of these two important forces in our national life has placed in bold relief certain positive values in the consistent application to public institutions generally, and public schools particularly, of the constitutional decree against official involvements of religion which might produce the evils the Framers meant the Establishment Clause to forestall.   The public schools are supported entirely, in most communities, by public funds—funds exacted not only from parents, nor alone from those who hold particular religious views, nor indeed from those who subscribe to any creed at all.   It is implicit in the history and character of American public education that the public schools serve a uniquely

*public* function the training of American citizens in an atmosphere free of parochial, divisive, or separatist influences of any sort—an atmosphere in which children may assimilate a heritage common to all American groups and religions. See *Illinois ex rel. McCollum* v. *Board of Education,* 333 U. S. 203. This is a heritage neither theistic nor atheistic, but simply civic and patriotic. See *Meyer* v. *Nebraska,* 262 U. S. 390, 400–403.

Attendance at the public schools has never been compulsory; parents remain morally and constitutionally free to choose the academic environment in which they wish their children to be educated. The relationship of the Establishment Clause of the First Amendment to the public school system is preeminently that of reserving such a choice to the individual parent, rather than vesting it in the majority of voters of each State or school district. The choice which is thus preserved is between a public secular education with its uniquely democratic values, and some form of private or sectarian education, which offers values of its own. In my judgment the First Amendment forbids the State to inhibit that freedom of choice by diminishing the attractiveness of either alternative—either by restricting the liberty of the private schools to inculcate whatever values they wish, or by jeopardizing the freedom of the public schools from private or sectarian pressures. The choice between these very different forms of education is one—very much like the choice of whether or not to worship—which our Constitution leaves to the individual parent. It is no proper function of the state or local government to influence or restrict that election. The lesson of history—drawn more from the experiences of other countries than from our own—is that a system of free public education forfeits its unique contribution to the growth of democratic citizenship when that choice ceases to be freely available to each parent.

## II.

The exposition by this Court of the religious guarantees of the First Amendment has consistently reflected and reaffirmed the concerns which impelled the Framers to write those guarantees into the Constitution. It would be neither possible nor appropriate to review here the entire course of our decisions on religious questions. There emerge from those decisions, however, three principles of particular relevance to the issue presented by the cases at bar, and some attention to those decisions is therefore appropriate.

*First.* One line of decisions derives from contests for control of a church property or other internal ecclesiastical disputes. This line has settled the proposition that in order to give effect to the First Amendment's purpose of requiring on the part of all organs of government a strict neutrality toward theological questions, courts should not undertake to decide such questions. These principles were first expounded in the case of *Watson* v. *Jones,* 13 Wall. 679, which declared that judicial intervention in such a controversy would open up "the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination . . . ." 13 Wall., at 733. Courts above all must be neutral, for "[t]he law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." [9] 13 Wall., at 728. This principle has re-

---

[9] See Comment, The Power of Courts Over the Internal Affairs of Religious Groups, 43 Calif. L. Rev. 322 (1955); Comment, Judicial Intervention in Disputes Within Independent Church Bodies, 54 Mich. L. Rev. 102 (1955); Note, Judicial Intervention in Disputes Over the Use of Church Property, 75 Harv. L. Rev. 1142 (1962). Compare. *Vidal* v. *Girard's Executors,* 2 How. 127. The principle of judicial nonintervention in essentially religious disputes appears to have been reflected in the decisions of several state courts declining to enforce essentially private agreements concerning the religious edu-

cently been reaffirmed in *Kedroff v. St. Nicholas Cathedral*, 344 U. S. 94; and *Kreshik v. St. Nicholas Cathedral*, 363 U. S. 190.

The mandate of judicial-neutrality in theological controversies met its severest test in *United States v. Ballard*, 322 U. S. 78. That decision put in sharp relief certain principles which bear directly upon the questions presented in these cases. Ballard was indicted for fraudulent use of the mails in the dissemination of religious literature. He requested that the trial court submit to the jury the question of the truthfulness of the religious views he championed. The requested charge was refused, and we upheld that refusal, reasoning that the First Amendment foreclosed any judicial inquiry into the truth or falsity of the defendant's religious beliefs. We said: "Man's relation to his God was made no concern of the state. He was granted the right to worship as he pleased and to answer to no man for the verity of his religious views." "Men may believe what they cannot

---

cation and worship of children of separated or divorced parents. See, *e. g., Hackett v. Hackett*, 78 Ohio Abs. 485, 150 N. E. 2d 431; *Stanton v. Stanton*, 213 Ga. 545, 100 S. E. 2d 289; Friedman, The Parental Right to Control the Religious Education of a Child, 29 Harv. L. Rev. 485 (1916); 72 Harv. L. Rev. 372 (1958); Note, 10 West. Res. L. Rev. 171 (1959).

Governmental nonintervention in religious affairs and institutions seems assured by Article 26 of the Constitution of India, which provides:

"Subject to public order, morality and health, every religious denomination or any section thereof shall have the right—

"(a) to establish and maintain institutions for religious and charitable purposes;

"(b) to manage its own affairs in matters of religion;

"(c) to own and acquire movable and immovable property; and

"(d) to administer such property in accordance with law." See 1. Chaudhri, Constitutional Rights and Limitations (1955), 875. This Article does not, however, appear to have completely foreclosed judicial inquiry into the merits of intradenominational disputes. See Gledhill, Fundamental Rights in India (1955), 101–102.

prove. They may not be put to the proof of their religious doctrines or beliefs. . . . Many take their gospel from the New Testament. But it would hardly be supposed that they could be tried before a jury charged with the duty of determining whether those teachings contained false representations." 322 U. S., at 86–87.

The dilemma presented by the case was severe. While the alleged truthfulness of *nonreligious* publications could ordinarily have been submitted to the jury, Ballard was deprived of that defense only because the First Amendment forbids governmental inquiry into the verity of *religious* beliefs. In dissent Mr. Justice Jackson expressed the concern that under this construction of the First Amendment "[p]rosecutions of this character easily could degenerate into religious persecution." 322 U. S., at 95. The case shows how elusive is the line which enforces the Amendment's injunction of strict neutrality, while manifesting no official hostility toward religion— a line which must be considered in the cases now before us.[10] Some might view the result of the *Ballard* case as a manifestation of hostility—in that the conviction stood because the defense could not be raised. To others it

---

[10] For a discussion of the difficulties inherent in the *Ballard* case, see Kurland, Religion and the Law (1962), 75–79. This Court eventually reversed the convictions on the quite unrelated ground that women had been systematically excluded from the jury, *Ballard v. United States,* 329 U. S. 187. For discussions of the difficulties in interpreting and applying the First Amendment so as to foster the objective of neutrality without hostility, see, *e. g.,* Katz, Freedom of Religion and State Neutrality, 20 U. of Chi. L. Rev. 426, 438 (1953); Kauper, Church, State, and Freedom: A Review, 52 Mich. L. Rev. 829, 842 (1954). Compare, for an interesting apparent attempt to avoid the *Ballard* problem at the international level, Article 3 of the Multilateral Treaty between the United States and certain American Republics, which provides that extradition will not be granted, *inter alia,* when "the offense is . . . directed against religion." Blakely, American State Papers and Related Documents on Freedom in Religion (4th rev. ed. 1949), 316.

might represent merely strict adherence to the principle of neutrality already expounded in the cases involving doctrinal disputes. Inevitably, insistence upon neutrality, vital as it surely is for untrammeled religious liberty, may appear to border upon religious hostility. But in the long view the independence of both church and state in their respective spheres will be better served by close adherence to the neutrality principle. If the choice is often difficult, the difficulty is endemic to issues implicating the religious guarantees of the First Amendment. Freedom of religion will be seriously jeopardized if we admit exceptions for no better reason than the difficulty of delineating hostility from neutrality in the closest cases.

*Second.* It is only recently that our decisions have dealt with the question whether issues arising under the Establishment Clause may be isolated from problems implicating the Free Exercise Clause. *Everson* v. *Board of Education,* 330 U. S. 1, is in my view the first of our decisions which treats a problem of asserted unconstitutional involvement as raising questions purely under the Establishment Clause. A scrutiny of several earlier decisions said by some to have etched the contours of the clause shows that such cases neither raised nor decided any constitutional issues under the First Amendment. *Bradfield* v. *Roberts,* 175 U. S. 291, for example, involved challenges to a federal grant to a hospital administered by a Roman Catholic order. The Court rejected the claim for lack of evidence that any sectarian influence changed its character as a secular institution chartered as such by the Congress.[11]

*Quick Bear* v. *Leupp,* 210 U. S. 50, is also illustrative. The immediate question there was one of statutory construction, although the issue had originally involved the

---

[11] See Kurland, Religion and the Law (1962), 32–34.

constitutionality of the use of federal funds to support sectarian education on Indian reservations. Congress had already prohibited federal grants for that purpose, thereby removing the broader issue, leaving only the question whether the statute authorized the appropriation for religious teaching of Treaty funds held by the Government in trust for the Indians. Since these were the Indians' own funds, the Court held only that the Indians might direct their use for such educational purposes as they chose, and that the administration by the Treasury of the disbursement of the funds did not inject into the case any issue of the propriety of the use of federal moneys.[12] Indeed, the Court expressly approved the reasoning of the Court of Appeals that to deny the Indians the right to spend their own moneys for religious purposes of their choice might well infringe the free exercise of their religion: "it seems inconceivable that Congress should have intended to prohibit them from receiving religious education at their own cost if they so desired it . . . ." 210 U. S., at 82. This case forecast, however, an increasingly troublesome First Amendment paradox: that the logical interrelationship between the Establishment and Free Exercise Clauses may produce situations where an injunction against an apparent establishment must be withheld in order to avoid infringement of rights of free exercise. That paradox was not squarely presented in *Quick Bear*, but the care taken by the Court

---

[12] Compare the treatment of an apparently very similar problem in Article 28 of the Constitution of India:

"(1) No religious instruction shall be provided in any educational institution wholly maintained out of State funds.

"(2) Nothing in clause (1) shall apply to an educational institution which is administered by the State but has been established under any endowment or trust which requires that religious instruction shall be imparted in such institution." 1 Chaudhri, Constitutional Rights and Limitations (1955), 875–876, 939.

to avoid a constitutional confrontation discloses an aware-
ness of possible conflicts between the two clauses. I
shall come back to this problem later, *infra,* pp. 296–299.

A third case in this group is *Cochran* v. *Louisiana State
Board,* 281 U. S. 370, which involved a challenge to a
state statute providing public funds to support a loan of
free textbooks to pupils of both public and private
schools. The constitutional issues in this Court extended
no further than the claim that this program amounted to a
taking of private property for nonpublic use. The Court
rejected the claim on the ground that no private use of
property was involved; ". . . we can not doubt that the
taxing power of the State is exerted for a public purpose."
281 U. S., at 375. The case therefore raised no issue under
the First Amendment.[13]

In *Pierce* v. *Society of Sisters,* 268 U. S. 510, a Catholic
parochial school and a private but nonsectarian military
academy challenged a state law requiring all children
between certain ages to attend the public schools. This
Court held the law invalid as an arbitrary and unreason-
able interference both with the rights of the schools and
with the liberty of the parents of the children who at-
tended them. The due process guarantee of the Four-
teenth Amendment "excludes any general power of the
State to standardize its children by forcing them to accept
instruction from public teachers only." 268 U. S., at 535.
While one of the plaintiffs was indeed a parochial school,
the case obviously decided no First Amendment question
but recognized only the constitutional right to estab-
lish and patronize private schools—including parochial
schools—which meet the state's reasonable minimum
curricular requirements.

---

[13] See Kurland, Religion and the Law (1962), 28–31; Fellman,
Separation of Church and State in the United States: A Summary
View, 1950 Wis. L. Rev. 427, 442.

*Third.* It is true, as the Court says, that the "two clauses [Establishment and Free Exercise] may overlap." Because of the overlap, however, our decisions under the Free Exercise Clause bear considerable relevance to the problem now before us, and should be briefly reviewed. The early free exercise cases generally involved the objections of religious minorities to the application to them of general nonreligious legislation governing conduct. *Reynolds* v. *United States,* 98 U. S. 145, involved the claim that a belief in the sanctity of plural marriage precluded the conviction of members of a particular sect under nondiscriminatory legislation against such marriage. The Court rejected the claim, saying:

> "Laws are made for the government of actions, and while they cannot interfere with mere religious beliefs and opinions, they may with practices. . . . Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances." [14] 98 U. S., at 166–167.

---

[14] This distinction, implicit in the First Amendment, had been made explicit in the original Virginia Bill of Rights provision that "all men should enjoy the fullest toleration in the exercise of religion according. to the dictates of conscience, unpunished and unrestrained by the magistrate, unless under color of religion any man disturb the peace, the happiness, or safety of society." See Cobb, The Rise of Religious Liberty in America (1902), 491. Concerning various legislative limitations and restraints upon religiously motivated behavior which endangers or offends society, see Manwaring, Render Unto Caesar: The Flag-Salute Controversy (1962), 41–52. Various courts have applied this principle to proscribe certain religious exercises or activities which were thought to threaten the safety or morals of the participants or the rest of the community, *e. g., State* v. *Massey,* 229 N. C.

*Davis* v. *Beason,* 133 U. S. 333, similarly involved the claim that the First Amendment insulated from civil punishment certain practices inspired or motivated by religious beliefs. The claim was easily rejected: "It was never intended or supposed that the amendment could be invoked as a protection against legislation for the punishment of acts inimical to the peace, good order and morals of society." 133 U. S., at 342. See also *Mormon Church* v. *United States,* 136 U. S. 1; *Jacobson* v. *Massachusetts,* 197 U. S. 11; *Prince* v. *Massachusetts,* 321 U. S. 158; *Cleveland* v. *United States,* 329 U. S. 14.

But we must not confuse the issue of governmental power to regulate or prohibit conduct *motivated by religious beliefs* with the quite different problem of governmental authority to compel behavior *offensive to religious principles.* In *Hamilton* v. *Regents of the University of California,* 293 U. S. 245, the question was that of the power of a State to compel students at the State University to participate in military training instruction against their religious convictions. The validity of the statute was sustained against claims based upon the First Amendment. But the decision rested on a very narrow principle: since there was neither a constitutional right nor a legal obligation to attend the State University, the obligation to participate in military training courses,

---

734, 51 S. E. 2d 179; *Harden* v. *State,* 188 Tenn. 17, 216 S. W. 2d 708; *Lawson* v. *Commonwealth,* 291 Ky. 437, 164 S. W. 2d 972; cf. *Sweeney* v. *Webb,* 33 Tex. Civ. App. 324, 76 S. W. 766.

That the principle of these cases, and the distinction between belief and behavior, are susceptible of perverse application, may be suggested by Oliver Cromwell's mandate to the besieged Catholic community in Ireland:

"As to freedom of conscience, I meddle with no man's conscience; but if you mean by that, liberty to celebrate the Mass, I would have you understand that in no place where the power of the Parliament of England prevails shall that be permitted." Quoted in Hook, The Paradoxes of Freedom (1962), 23.

reflecting a legitimate state interest, might properly be imposed upon those who chose to attend. Although the rights protected by the First and Fourteenth Amendments were presumed to include "the right to entertain the beliefs, to adhere to the principles and to teach the doctrines on which these students base their objections to the order prescribing military training," those Amendments were construed not to free such students from the military training obligations if they chose to attend the University. Justices Brandeis, Cardozo and Stone, concurring separately, agreed that the requirement infringed no constitutionally protected liberties. They added, however, that the case presented no question under the Establishment Clause. The military instruction program was not an establishment since it in no way involved "instruction in the practice or tenets of a religion." 293 U. S., at 266. Since the only question was one of free exercise, they concluded, like the majority, that the strong state interest in training a citizen militia justified the restraints imposed, at least so long as attendance at the University was voluntary.[15]

*Hamilton* has not been overruled, although *United States* v. *Schwimmer*, 279 U. S. 644, and *United States* v. *Macintosh*, 283 U. S. 605, upon which the Court in *Hamilton* relied, have since been overruled by *Girouard* v. *United States*, 328 U. S. 61. But if *Hamilton* retains any vitality with respect to higher education, we recognized its inapplicability to cognate questions in the public primary and secondary schools when we held in *West Virginia Board of Education* v. *Barnette, supra,* that a State had no power to expel from public schools students who refused on religious grounds to comply with a daily flag

---

[15] With respect to the decision in *Hamilton* v. *Regents*, compare two recent comments: Kurland, Religion and the Law (1962), 40; and French, Comment, Unconstitutional Conditions: An Analysis, 50 Geo. L. J. 234, 246 (1961).

salute requirement. Of course, such a requirement was no more a law "respecting an establishment of religion" than the California law compelling the college students to take military training. The *Barnette* plaintiffs, moreover, did not ask that the whole exercise be enjoined, but only that an excuse or exemption be provided for those students whose religious beliefs forbade them to participate in the ceremony. The key to the holding that such a requirement abridged rights of free exercise lay in the fact that attendance at school was not voluntary but compulsory. The Court said:

> "This issue is not prejudiced by the Court's previous holding that where a State, without compelling attendance, extends college facilities to pupils who voluntarily enroll, it may prescribe military training as part of the course without offense to the Constitution. . . . *Hamilton* v. *Regents*, 293 U. S. 245. In the present case attendance is not optional." 319 U. S., at 631–632.

The *Barnette* decision made another significant point. The Court held that the State must make participation in the exercise voluntary for all students and not alone for those who found participation obnoxious on religious grounds. In short, there was simply no need to "inquire whether non-conformist beliefs will exempt from the duty to salute" because the Court found no state "power to make the salute a legal duty." 319 U. S., at 635.

The distinctions between *Hamilton* and *Barnette* are, I think, crucial to the resolution of the cases before us. The different results of those cases are attributable only in part to a difference in the strength of the particular state interests which the respective statutes were designed to serve. Far more significant is the fact that *Hamilton* dealt with the voluntary attendance at college of young adults, while *Barnette* involved the compelled attendance

of young children at elementary and secondary schools.[16] This distinction warrants a difference in constitutional results. And it is with the involuntary attendance of young school children that we are exclusively concerned in the cases now before the Court.

### III.

No one questions that the Framers of the First Amendment intended to restrict exclusively the powers of the Federal Government.[17] Whatever limitations that Amendment now imposes upon the States derive from the Fourteenth Amendment. The process of absorption of the religious guarantees of the First Amendment as protections against the States under the Fourteenth Amendment began with the Free Exercise Clause. In 1923 the Court held that the protections of the Fourteenth included at least a person's freedom "to worship God according to the dictates of his own conscience . . . ." [18] *Meyer* v. *Nebraska,* 262 U. S. 390, 399. See also *Hamilton* v. *Regents, supra,* at 262. *Cantwell* v. *Connecticut,* 310 U. S. 296, completed in 1940 the process of absorption.

---

[16] See generally as to the background and history of the *Barnette* case, Manwaring, Render Unto Caesar: The Flag-Salute Controversy (1962), especially at 252–253. Compare, for the interesting treatment of a problem similar to that of *Barnette,* in a nonconstitutional context, *Chabot* v. *Les Commissaires D'Ecoles de Lamorandière,* [1957] Que. B. R. 707, noted in 4 McGill L. J. 268 (1958).

[17] See *Barron* v. *Baltimore,* 7 Pet. 243; *Permoli* v. *New Orleans,* 3 How. 589, 609; cf. *Fox* v. *Ohio,* 5 How. 410, 434–435; *Withers* v. *Buckley,* 20 How. 84, 89–91. As early as 1825, however, at least one commentator argued that the guarantees of the Bill of Rights, excepting only those of the First and Seventh Amendments, were meant to limit the powers of the States. Rawle, A View of the Constitution of the United States of America (1825), 120–130.

[18] In addition to the statement of this Court in *Meyer,* at least one state court assumed as early as 1921 that claims of abridgment of the free exercise of religion in the public schools must be tested under the guarantees of the First Amendment as well as those of the state

of the Free Exercise Clause and recognized its dual aspect: the Court affirmed freedom of belief as an absolute liberty, but recognized that conduct, while it may also be comprehended by the Free Exercise Clause, "remains subject to regulation for the protection of society." 310 U. S., at 303–304. This was a distinction already drawn by *Reynolds* v. *United States, supra.* From the beginning this Court has recognized that while government may regulate the behavioral manifestations of religious beliefs, it may not interfere at all with the beliefs themselves.

The absorption of the Establishment Clause has, however, come later and by a route less easily charted. It has been suggested, with some support in history, that absorption of the First Amendment's ban against congressional legislation "respecting an establishment of religion" is conceptually impossible because the Framers meant the Establishment Clause also to foreclose any attempt by Congress to disestablish the existing official state churches.[19] Whether or not such was the understanding of the Framers and whether such a purpose would have inhibited the absorption of the Establishment Clause at the threshold of the Nineteenth Century are questions not dispositive of our present inquiry. For it is

---

constitution. *Hardwick* v. *Board of School Trustees,* 54 Cal. App. 696, 704–705, 205 P. 49, 52. See Louisell and Jackson, Religion, Theology, and Public Higher Education, 50 Cal. L. Rev. 751, 772 (1962). Even before the Fourteenth Amendment, New York State enacted a general common school law in 1844 which provided that no religious instruction should be given which could be construed to violate the rights of conscience "as secured by the constitution of this state and the United States." N. Y. Laws, 1844, c. 320, § 12.

[19] See, *e. g.,* Snee, Religious Disestablishment and the Fourteenth Amendment, 1954 Wash. U. L. Q. 371, 373–394; Kruse, The Historical Meaning and Judicial Construction of the Establishment of Religion Clause of the First Amendment, 2 Washburn L. J. 65, 84–85, 127–130 (1962); Katz, Religion and American Constitutions, Address at Northwestern University Law School, March 20, 1963, pp. 6–7. But

clear on the record of history that the last of the formal state establishments was dissolved more than three decades before the Fourteenth Amendment was ratified, and thus the problem of protecting official state churches from federal encroachments could hardly have been any concern of those who framed the post-Civil War Amendments.[20] Any such objective of the First Amendment, having become historical anachronism by 1868, cannot be thought to have deterred the absorption of the Establishment Clause to any greater degree than it would, for example, have deterred the absorption of the Free Exercise Clause. That no organ of the Federal Government possessed in 1791 any power to restrain the interference of the States in religious matters is indisputable. See *Permoli* v. *New Orleans*, 3 How. 589. It is equally plain, on the other hand, that the Fourteenth Amendment created a panoply of new federal rights for the protection of citizens of the various States. And among those rights was freedom from such state governmental involvement in the affairs of religion as the Establishment Clause had originally foreclosed on the part of Congress.

---

see the debate in the Constitutional Convention over the question whether it was necessary or advisable to include among the enumerated powers of the Congress a power "to establish an University, in which no preferences or distinctions should be allowed on account of religion." At least one delegate thought such an explicit delegation "is not necessary," for "[t]he exclusive power at the Seat of Government, will reach the object." The proposal was defeated by only two votes. 2 Farrand, Records of the Federal Convention of 1787 (1911), 616.

[20] The last formal establishment, that of Massachusetts, was dissolved in 1833. The process of disestablishment in that and other States is described in Cobb, The Rise of Religious Liberty in America (1902), c. X; Sweet, The Story of Religion in America (1950), c. XIII. The greater relevance of conditions existing at the time of adoption of the Fourteenth Amendment is suggested in Note, State Sunday Laws and the Religious Guarantees of the Federal Constitution, 73 Harv. L. Rev. 729, 739, n. 79 (1960).

It has also been suggested that the "liberty" guaranteed by the Fourteenth Amendment logically cannot absorb the Establishment Clause because that clause is not one of the provisions of the Bill of Rights which in terms protects a "freedom" of the individual.  See Corwin, A Constitution of Powers in a Secular State (1951), 113–116. The fallacy in this contention, I think, is that it underestimates the role of the Establishment Clause as a coguarantor, with the Free Exercise Clause, of religious liberty.  The Framers did not entrust the liberty of religious beliefs to either clause alone.  The Free Exercise Clause "was not to be the full extent of the Amendment's guarantee of freedom from governmental intrusion in matters of faith."  *McGowan* v. *Maryland, supra,* at 464 (opinion of Frankfurter, J.).

Finally, it has been contended that absorption of the Establishment Clause is precluded by the absence of any intention on the part of the Framers of the Fourteenth Amendment to circumscribe the residual powers of the States to aid religious activities and institutions in ways which fell short of formal establishments.[21]  That argument relies in part upon the express terms of the

---

[21] See Corwin, A Constitution of Powers in a Secular State (1951), 111–114; Fairman and Morrison, Does the Fourteenth Amendment Incorporate the Bill of Rights? 2 Stan. L. Rev. 5 (1949); Meyer, Comment, The Blaine Amendment and the Bill of Rights, 64 Harv. L. Rev. 939 (1951); Howe, Religion and Race in Public Education, 8 Buffalo L. Rev. 242, 245–247 (1959).  Cf. Cooley, Principles of Constitutional Law (2d ed. 1891), 213–214.  Compare Professor Freund's comment:

"Looking back, it is hard to see how the Court could have done otherwise, how it could have persisted in accepting freedom of contract as a guaranteed liberty without giving equal status to freedom of press and speech, assembly, and religious observance.  What does not seem so inevitable is the inclusion within the Fourteenth Amendment of the concept of nonestablishment of religion in the sense of forbidding nondiscriminatory aid to religion, where there is no interference with freedom of religious exercise."  Freund, The Supreme Court of the United States (1961), 58–59.

abortive Blaine Amendment—proposed several years after the adoption of the Fourteenth Amendment—which would have added to the First Amendment a provision that "[n]o State shall make any law respecting an establishment of religion . . . ." Such a restriction would have been superfluous, it is said, if the Fourteenth Amendment had already made the Establishment Clause binding upon the States.

The argument proves too much, for the Fourteenth Amendment's protection of the free exercise of religion can hardly be questioned; yet the Blaine Amendment would also have added an explicit protection against state laws abridging that liberty.[22] Even if we assume that the draftsmen of the Fourteenth Amendment saw no immediate connection between its protections against state action infringing personal liberty and the guarantees of the First Amendment, it is certainly too late in the day to suggest that their assumed inattention to the question dilutes the force of these constitutional guarantees in their application to the States.[23] It is enough to conclude

---

[22] The Blaine Amendment, 4 Cong. Rec. 5580, included also a more explicit provision that "no money raised by taxation in any State for the support of public schools or derived from any public fund therefor, nor any public lands devoted thereto, shall ever be under the control of any religious sect or denomination . . . ." The Amendment passed the House but failed to obtain the requisite two-thirds vote in the Senate. See 4 Cong. Rec. 5595. The prohibition which the Blaine Amendment would have engrafted onto the American Constitution has been incorporated in the constitutions of other nations; compare Article 28 (1) of the Constitution of India ("No religious instruction shall be provided in any educational institution wholly maintained out of State funds"); Article XX of the Constitution of Japan (". . . the State and its organs shall refrain from religious education or any other religious activity"). See 1 Chaudhri, Constitutional Rights and Limitations (1955), 875, 876.

[23] Three years after the adoption of the Fourteenth Amendment, Mr. Justice Bradley wrote a letter expressing his views on a proposed constitutional amendment designed to acknowledge the dependence

that the religious liberty embodied in the Fourteenth Amendment would not be viable if the Constitution were interpreted to forbid only establishments ordained by Congress.[24]

---

of the Nation upon God, and to recognize the Bible as the foundation of its laws and the supreme ruler of its conduct:

"I have never been able to see the necessity or expediency of the movement for obtaining such an amendment. The Constitution was evidently framed and adopted by the people of the United States with the fixed determination to allow absolute religious freedom and equality, and to avoid all appearance even of a State religion, or a State endorsement of any particular creed or religious sect. . . . And after the Constitution in its original form was adopted, the people made haste to secure an amendment that Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. This shows the earnest desire of our Revolutionary fathers that religion should be left to the free and voluntary action of the people themselves. I do not regard it as manifesting any hostility to religion, but as showing a fixed determination to leave the people entirely free on the subject.

"And it seems to me that our fathers were wise; that the great voluntary system of this country is quite as favorable to the promotion of real religion as the systems of governmental protection and patronage have been in other countries. And whilst I do not understand that the association which you represent desire to invoke any governmental interference, still the amendment sought is a step in that direction which our fathers (quite as good Christians as ourselves) thought it wise not to take. In this country they thought they had settled one thing at least, that it is not the province of government to teach theology.

". . . Religion, as the basis and support of civil government, must reside, not in the written Constitution, but in the people themselves. And we cannot legislate religion into the people. It must be infused by gentler and wiser methods." Miscellaneous Writings of Joseph P. Bradley (1901), 357–359.

For a later phase of the controversy over such a constitutional amendment as that which Justice Bradley opposed, see Finlator, Christ in Congress, 4 J. Church and State 205 (1962).

[24] There is no doubt that, whatever "establishment" may have meant to the Framers of the First Amendment in 1791, the draftsmen of the Fourteenth Amendment three quarters of a century later understood the Establishment Clause to foreclose many incidental

The issue of what particular activities the Establishment Clause forbids the States to undertake is our more immediate concern. In *Everson* v. *Board of Education,* 330 U. S. 1, 15–16, a careful study of the relevant history led the Court to the view, consistently recognized in decisions since *Everson,* that the Establishment Clause embodied the Framers' conclusion that government and religion have discrete interests which are mutually best served when each avoids too close a proximity to the other. It is not only the nonbeliever who fears the injection of sectarian doctrines and controversies into the civil polity, but in as high degree it is the devout believer who fears the secularization of a creed which becomes too deeply involved with and dependent upon the government.[25] It

---

forms of governmental aid to religion which fell far short of the creation or support of an official church. The Report of a Senate Committee as early as 1853, for example, contained this view of the Establishment Clause:

"If Congress has passed, or should pass, any law which, fairly construed, has in any degree introduced, or should attempt to introduce, in favor of any church, or ecclesiastical association, or system of religious faith, all or any one of these obnoxious particulars— endowment at the public expense, peculiar privileges to its members, or disadvantages or penalties upon those who should reject its doctrines or belong to other communions—such law would be a 'law respecting an establishment of religion,' and, therefore, in violation of the constitution." S. Rep. No. 376, 32d Cong., 2d Sess. 1–2.

Compare Thomas M. Cooley's exposition in the year in which the Fourteenth Amendment was ratified:

"Those things which are not lawful under any of the American constitutions may be stated thus:—

"1. Any law respecting an establishment of religion. . . .

"2. Compulsory support, by taxation or otherwise, of religious instruction. Not only is no one denomination to be favored at the expense of the rest, but all support of religious instruction must be entirely voluntary." Cooley, Constitutional Limitations (1st ed. 1868), 469.

[25] Compare, *e. g.,* Miller, Roger Williams: His Contribution to the American Tradition (1953), 83, with Madison, Memorial and Remonstrance Against Religious Assessments, reprinted as an Ap-

has rightly been said of the history of the Establishment Clause that "our tradition of civil liberty rests not only on the secularism of a Thomas Jefferson but also on the fervent sectarianism . . . of a Roger Williams." Freund, The Supreme Court of the United States (1961), 84.

Our decisions on questions of religious education or exercises in the public schools have consistently reflected this dual aspect of the Establishment Clause. *Engel* v. *Vitale* unmistakably has its roots in three earlier cases which, on cognate issues, shaped the contours of the Establishment Clause. First, in *Everson* the Court held that reimbursement by the town of parents for the cost of transporting their children by public carrier to parochial (as well as public and private nonsectarian) schools did not offend the Establishment Clause.— Such reimbursement, by easing the financial burden upon Catholic parents, may indirectly have fostered the operation of the Catholic schools, and may thereby indirectly have facilitated the teaching of Catholic principles, thus serving ultimately a religious goal. But this form of governmental assistance was difficult to distinguish from myriad other incidental if not insignificant government benefits enjoyed by religious institutions—fire and police protection, tax exemptions, and the pavement of streets and sidewalks, for example. "The State contributes no money to the schools. It does not support them. Its legislation, as applied, does no more than provide a general program to help parents get their children, regardless of their religion, safely and expeditiously to and from

pendix to the dissenting opinion of Mr. Justice Rutledge, *Everson* v. *Board of Education, supra,* at 63–72. See also Cahn, On Government and Prayer, 37 N. Y. U. L. Rev. 981, 982–985 (1962); Jefferson's Bill for Establishing Religious Freedom, in Padover, The Complete Jefferson (1943), 946–947; Moulton and Myers, Report on Appointing Chaplains to the Legislature of New York, in Blau, Cornerstones of Religious Freedom in America (1949), 141–156; Bury, A History of Freedom of Thought (2d ed. 1952), 75–76.

accredited schools." 330 U. S., at 18. Yet even this form of assistance was thought by four Justices of the *Everson* Court to be barred by the Establishment Clause because too perilously close to that public support of religion forbidden by the First Amendment.

The other two cases, *Illinois ex rel. McCollum* v. *Board of Education,* 333 U. S. 203, and *Zorach* v. *Clauson,* 343 U. S. 306, can best be considered together. Both involved programs of released time for religious instruction of public school students. I reject the suggestion that *Zorach* overruled *McCollum* in silence.[26] The distinction which the Court drew in *Zorach* between the two cases is, in my view, faithful to the function of the Establishment Clause.

I should first note, however, that *McCollum* and *Zorach* do not seem to me distinguishable in terms of the free exercise claims advanced in both cases.[27] The nonparticipant in the *McCollum* program was given secular instruction in a separate room during the times his classmates had religious lessons; the nonparticipant in any *Zorach* program also received secular instruction, while his classmates repaired to a place outside the school for religious instruction.

The crucial difference, I think, was that the *McCollum* program offended the Establishment Clause while the *Zorach* program did not. This was not, in my view, because of the difference in public expenditures involved. True, the *McCollum* program involved the regular use of school facilities, classrooms, heat and light and time from the regular school day—even though the actual

---

[26] See, *e. g.,* Spicer, The Supreme Court and Fundamental Freedoms (1959), 83–84; Kauper, Church, State, and Freedom: A Review, 52 Mich. L. Rev. 829, 839 (1954); Reed, Church-State and the Zorach Case, 27 Notre Dame Lawyer 529, 539–541 (1952).

[27] See 343 U. S., at 321–322 (Frankfurter, J., dissenting); Kurland, Religion and the Law (1962), 89. I recognize that there is a question whether in *Zorach* the free exercise claims asserted were in fact proved. 343 U. S., at 311.

incremental cost may have been negligible. All religious instruction under the *Zorach* program, by contrast, was carried on entirely off the school premises, and the teacher's part was simply to facilitate the children's release to the churches. The deeper difference was that the *McCollum* program placed the religious instructor in the public school classroom in precisely the position of authority held by the regular teachers of secular subjects, while the *Zorach* program did not.[28] The *McCollum* pro-

---

[28] Mr. Justice Frankfurter described the effects of the *McCollum* program thus:

"Religious education so conducted on school time and property is patently woven into the working scheme of the school. The Champaign arrangement thus presents powerful elements of inherent pressure by the school system in the interest of religious sects. . . . As a result, the public school system of Champaign actively furthers inculcation in the religious tenets of some faiths, and in the process sharpens the consciousness of religious differences at least among some of the children committed to its care." 333 U. S., at 227–228.

For similar reasons some state courts have enjoined the public schools from employing or accepting the services of members of religious orders even in the teaching of secular subjects, *e. g., Zellers* v. *Huff,* 55 N. M. 501, 236 P. 2d 949; *Berghorn* v. *Reorganized School Dist. No. 8,* 364 Mo. 121, 260 S. W. 2d 573; compare ruling of Texas Commissioner of Education, Jan. 25, 1961, in 63 American Jewish Yearbook (1962), 188. Over a half century ago a New York court sustained a school board's exclusion from the public schools of teachers wearing religious garb on similar grounds:

"Then all through the school hours these teachers . . . were before the children as object lessons of the order and church of which they were members. It is within our common observation that young children . . . are very susceptible to the influence of their teachers and of the kind of object lessons continually before them in schools conducted under these circumstances and with these surroundings." *O'Connor* v. *Hendrick,* 109 App. Div. 361, 371–372, 96 N. Y. Supp. 161, 169. See also *Commonwealth* v. *Herr,* 229 Pa. 132, 78 A. 68; Comment, Religious Garb in the Public Schools—A Study in Conflicting Liberties, 22 U. of Chi. L. Rev. 888 (1955).

Also apposite are decisions of several courts which have enjoined the use of parochial schools as part of the public school system, *Harfst*

gram, in lending to the support of sectarian instruction all the authority of the governmentally operated public school system, brought government and religion into that proximity which the Establishment Clause forbids. To be sure, a religious teacher presumably commands substantial respect and merits attention in his own right. But the Constitution does not permit that prestige and capacity for influence to be augmented by investiture of all the symbols of authority at the command of the lay teacher for the enhancement of secular instruction.

More recent decisions have further etched the contours of Establishment. In the *Sunday Law Cases,* we found in state laws compelling a uniform day of rest from worldly labor no violation of the Establishment Clause (*McGowan* v. *Maryland,* 366 U. S. 420). The basic

---

v. *Hoegen,* 349 Mo. 808, 163 S. W. 2d 609; or have invalidated programs for the distribution in public school classrooms of Gideon Bibles, *Brown* v. *Orange County Board of Public Instruction,* 128 So. 2d 181 (Fla. App.); *Tudor.* v. *Board of Education,* 14 N. J. 31, 100 A. 2d 857. See Note, The First Amendment and Distribution of Religious Literature in the Public Schools, 41 Va. L. Rev. 789, 803–806 (1955). In *Tudor,* the court stressed the role of the public schools in the Bible program:

". . . the public school machinery is used to bring about the distribution of these Bibles to the children . . . . In the eyes of the pupils and their parents the board of education has placed its stamp of approval upon this distribution and, in fact, upon the Gideon Bible itself. . . . This is more than mere 'accommodation' of religion permitted in the *Zorach* case. The school's part in this distribution is an active one and cannot be sustained on the basis of a mere assistance to religion." 14 N. J., at 51–52, 100 A. 2d, at 868. The significance of the teacher's authority was recognized by one early state court decision:

"The school being in session, the right to command was vested in the teacher, and the duty of obedience imposed upon the pupils. Under such circumstances a request and a command have the same meaning. A request from one in authority is understood to be a mere euphemism. It is in fact a command in an inoffensive form." *State ex rel. Freeman* v. *Scheve,* 65 Neb. 876, 880, 93 N. W. 169, 170.

ground of our decision was that, granted the Sunday Laws were first enacted for religious ends, they were continued in force for reasons wholly secular, namely, to provide a universal day of rest and ensure the health and tranquillity of the community. In other words, government may originally have decreed a Sunday day of rest for the impermissible purpose of supporting religion but abandoned that purpose and retained the laws for the permissible purpose of furthering overwhelmingly secular ends.

Such was the evolution of the contours of the Establishment Clause before *Engel* v. *Vitale*. There, a year ago, we held that the daily recital of the state-composed Regents' Prayer constituted an establishment of religion because, although the prayer itself revealed no *sectarian* content or purpose, its nature and meaning were quite clearly *religious*. New York, in authorizing its recitation, had not maintained that distance between the public and the religious sectors commanded by the Establishment Clause when it placed the "power, prestige and financial support of government" behind the prayer. In *Engel,* as in *McCollum,* it did not matter that the amount of time and expense allocated to the daily recitation was small so long as the exercise itself was manifestly religious. Nor did it matter that few children had complained of the practice, for the measure of the seriousness of a breach of the Establishment Clause has never been thought to be the number of people who complain of it.

We also held two Terms ago in *Torcaso* v. *Watkins, supra,* that a State may not constitutionally require an applicant for the office of Notary Public to swear or affirm that he believes in God. The problem of that case was strikingly similar to the issue presented 18 years before in the flag salute case, *West Virginia Board of Education* v. *Barnette, supra.* In neither case was there any claim of establishment of religion, but only of infringement of

the individual's religious liberty—in the one case, that of the nonbeliever who could not attest to a belief in God; in the other, that of the child whose creed forbade him to salute the flag. But *Torcaso* added a new element not present in *Barnette*. The Maryland test oath involved an attempt to employ essentially religious (albeit nonsectarian) means to achieve a secular goal to which the means bore no reasonable relationship. No one doubted the State's interest in the integrity of its Notaries Public, but that interest did not warrant the screening of applicants by means of a religious test. The *Sunday Law Cases* were different in that respect. Even if Sunday Laws retain certain religious vestiges, they are enforced today for essentially secular objectives which cannot be effectively achieved in modern society except by designating Sunday as the universal day of rest. The Court's opinions cited very substantial problems in selecting or enforcing an alternative day of rest. But the teaching of both *Torcaso* and the *Sunday Law Cases* is that government may not employ religious means to serve secular interests, however legitimate they may be, at least without the clearest demonstration that nonreligious means will not suffice.[29]

---

[29] See for other illustrations of the principle that where First Amendment freedoms are or may be affected, government must employ those means which will least inhibit the exercise of constitutional liberties, *Lovell* v. *Griffin*, 303 U. S. 444; *Schneider* v. *State*, 308 U. S. 147, 161; *Martin* v. *Struthers*, 319 U. S. 141; *Saia* v. *New York*, 334 U. S. 558; *Shelton* v. *Tucker*, 364 U. S. 479, 488–489; *Bantam Books, Inc.*, v. *Sullivan*, 372 U. S. 58, 66, 69–71. See also Note, State Sunday Laws and the Religious Guarantees of the Federal Constitution, 73 Harv. L. Rev. 729, 743–745 (1960); Freund, The Supreme Court of the United States (1961), 86–87; 74 Harv. L. Rev. 613 (1961). And compare *Miller* v. *Cooper*, 56 N. M. 355, 244 P. 2d 520 (1952), in which a state court permitted the holding of public school commencement exercises in a church building only because no public buildings in the community were adequate to accommodate the ceremony.

## IV.

I turn now to the cases before us.[30] The religious nature of the exercises here challenged seems plain. Unless *Engel* v. *Vitale* is to be overruled, or we are to engage in wholly disingenuous distinction, we cannot sus-

---

[30] No question has been raised in these cases concerning the standing of these parents to challenge the religious practices conducted in the schools which their children presently attend. Whatever authority *Doremus* v. *Board of Education*, 342 U. S. 429, might have on the question of the standing of one not the parent of children affected by the challenged exercises is not before us in these cases. Neither in *McCollum* nor in *Zorach* was there any reason to question the standing of the parent-plaintiffs under settled principles of justiciability and jurisdiction, whether or not their complaints alleged pecuniary loss or monetary injury. The free-exercise claims of the parents alleged injury sufficient to give them standing. If, however, the gravamen of the lawsuit were exclusively one of establishment, it might seem illogical to confer standing upon a parent who—though he is concededly in the best position to assert a free-exercise claim— suffers no financial injury, by reason of being a parent, different from that of the ordinary taxpayer, whose standing may be open to question. See Sutherland, Establishment According to *Engel*, 76 Harv. L. Rev. 25, 41–43 (1962). I would suggest several answers to this conceptual difficulty. First, the parent is surely the person 'most directly and immediately concerned about and affected by the challenged establishment, and to deny him standing either in his own right or on behalf of his child might effectively foreclose judicial inquiry into serious breaches of the prohibitions of the First Amendment—even though no special monetary injury could be shown. See *Schempp* v. *School District of Abington Township*, 177 F. Supp. 398, 407; Kurland, The Regents' Prayer Case: "Full of Sound and Fury, Signifying . . . ," 1962 Supreme Court Review 1, 22. Second, the complaint in every case thus far challenging an establishment has set forth at least a colorable claim of infringement of free exercise. When the complaint includes both claims, and neither is frivolous, it would surely be overtechnical to say that a parent who does not detail the monetary cost of the exercises to him may ask the court to pass only upon the free-exercise claim, however logically the two may be related. Cf. *Pierce* v. *Society of Sisters, supra; Truax* v. *Raich*, 239

tain these practices. Daily recital of the Lord's Prayer and the reading of passages of Scripture are quite as clearly breaches of the command of the Establishment Clause as was the daily use of the rather bland Regents' Prayer in the New York public schools. Indeed, I would suppose that, if anything, the Lord's Prayer and the Holy Bible are more clearly sectarian, and the present violations of the First Amendment consequently more serious. But the religious exercises challenged in these cases have a long history. And almost from the beginning, Bible reading and daily prayer in the schools have been the subject of debate, criticism by educators and other public officials, and proscription by courts and legislative councils. At the outset, then, we must carefully canvass both aspects of this history.

The use of prayers and Bible readings at the opening of the school day long antedates the founding of our Republic. The Rules of the New Haven Hopkins Grammar School required in 1684 "[t]hat the Scholars being

U. S. 33, 38–39; *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 458–460; *Bell* v. *Hood,* 327 U. S. 678; *Bantam Books, Inc.,* v. *Sullivan,* 372 U. S. 58, 64, n. 6. Finally, the concept of standing is a necessarily flexible one, designed principally to ensure that the plaintiffs have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions . . . ." *Baker* v. *Carr,* 369 U. S. 186, 204. It seems to me that even a cursory examination of the complaints in these two cases and the opinions below discloses that these parents have very real grievances against the respective school authorities which cannot be resolved short of constitutional adjudication. See generally Arthur Garfield Hays Civil Liberties Conference. Public Aid to Parochial Schools and Standing to Bring Suit, 12 Buffalo L. Rev. 35 (1962); Jaffe, Standing to Secure Judicial Review: Public Actions, 74 Harv. L. Rev. 1265 (1961); Sutherland, Due Process and Disestablishment, 62 Harv. L. Rev. 1306, 1327–1332 (1949); Comment, The Supreme Court, the First Amendment, and Religion in the Public Schools, 63 Col. L. Rev. 73, 94, n. 153 (1963).

called together, the Mr. shall every morning begin his work with a short prayer for a blessing on his Laboures and their learning . . . ." [31]   More rigorous was the provision in a 1682 contract with a Dutch schoolmaster in Flatbush, New York:

> "When the school begins, one of the children shall read the morning prayer, as it stands in the catechism, and close with the prayer before dinner; in the afternoon it shall begin with the prayer after dinner, and end with the evening prayer. The evening school shall begin with the Lord's prayer, and close by singing a psalm." [32]

After the Revolution, the new States uniformly continued these long-established practices in the private and the few public grammar schools.   The school committee of Boston in 1789, for example, required the city's several schoolmasters "daily to commence the duties of their office by prayer and reading a portion of the Sacred Scriptures . . . ." [33]   That requirement was mirrored throughout the original States, and exemplified the universal practice well into the nineteenth century.   As the free public schools gradually supplanted the private academies and sectarian schools between 1800 and 1850, morning devotional exercises were retained with few alterations.   Indeed, public pressures upon school administrators in many parts of the country would hardly have condoned abandonment of practices to which a century or more of private religious education had accustomed the American people. [34]   The controversy centered, in

---

[31] Quoted in Dunn, What Happened to Religious Education? (1958), 21.

[32] Quoted, *id.*, at 22.

[33] Quoted in Hartford, Moral Values in Public Education: Lessons From the Kentucky Experience (1958), 31.

[34] See Culver, Horace Mann and Religion in the Massachusetts Public Schools (1929), for an account of one prominent educator's

fact, principally about the elimination of plainly sectarian practices and textbooks, and led to the eventual substitution of nonsectarian, though still religious, exercises and materials.[35]

Statutory provision for daily religious exercises is, however, of quite recent origin. At the turn of this century, there was but one State—Massachusetts—which had a law making morning prayer or Bible reading obligatory. Statutes elsewhere either permitted such practices or simply left the question to local option. It was not until after 1910 that 11 more States, within a few years, joined Massachusetts in making one or both exercises compulsory.[36] The Pennsylvania law with which we are

---

efforts to satisfy both the protests of those who opposed continuation of sectarian lessons and exercises in public schools, and the demands of those who insisted upon the retention of some essentially religious practices. Mann's continued use of the Bible for what he regarded as nonsectarian exercises represented his response to these cross-pressures. See Mann, Religious Education, in Blau, Cornerstones of Religious Freedom in America (1949), 163–201 (from the Twelfth Annual Report for 1848 of the Secretary of the Board of Education of Massachusetts). See also Boles, The Bible, Religion, and the Public Schools (1961), 22–27.

[35] See 2 Stokes, Church and State in the United States (1950), 572–579; Greene, Religion and the State: The Making and Testing of an American Tradition (1941), 122–126.

[36] E. g., Ala. Code, Tit. 52, § 542; Del. Code Ann., Tit. 14, §§ 4101–4102; Fla. Stat. Ann. § 231.09 (2); Mass. Ann. Laws, c. 71, § 31; Tenn. Code Ann. § 49–1307 (4). Some statutes, like the recently amended Pennsylvania statute involved in *Schempp*, provide for the excusal or exemption of children whose parents do not wish them to participate. See generally Johnson and Yost, Separation of Church and State in the United States (1948), 33–36; Thayer, The Role of the School in American Society (1960), 374–375; Beth, The American Theory of Church and State (1958), 106–107. Compare with the American statutory approach Article 28 (3) of the Constitution of India:

"(3) No person attending any educational institution recognised by the State or receiving aid out of State funds shall be required to

concerned in the *Schempp* case, for example, took effect in 1913; and even the Rule of the Baltimore School Board involved in the *Murray* case dates only from 1905. In no State has there ever been a constitutional or statutory prohibition against the recital of prayers or the reading of Scripture, although a number of States have outlawed these practices by judicial decision or administrative order. What is noteworthy about the panoply of state and local regulations from which these cases emerge is the relative recency of the statutory codification of practices which have ancient roots, and the rather small number of States which have ever prescribed compulsory religious exercises in the public schools.

The purposes underlying the adoption and perpetuation of these practices are somewhat complex. It is beyond question that the religious benefits and values realized from daily prayer and Bible reading have usually been considered paramount, and sufficient to justify the continuation of such practices. To Horace Mann, embroiled in an intense controversy over the role of *sectarian* instruction and textbooks in the Boston public schools, there was little question that the regular use of the Bible—which he thought essentially nonsectarian—would bear fruit in the spiritual enlightenment of his pupils.[37] A contemporary of Mann's, the Commissioner of Education of a neighboring State, expressed a view which many enlightened educators of that day shared:

"As a textbook of morals the Bible is pre-eminent, and should have a prominent place in our schools,

take part in any religious instruction that may be imparted in such institution or to attend any religious worship that may be conducted in such institution or in any premises attached thereto unless such person or, if such person is a minor, his guardian has given his consent thereto." See 1 Chaudhri, Constitutional Rights and Limitations (1955), 876, 939.

[37] See note 34, *supra*.

either as a reading book or as a source of appeal and instruction. Sectarianism, indeed, should not be countenanced in the schools; but the Bible is not sectarian . . . . The Scriptures should at least be read at the opening of the school, if no more. Prayer may also be offered with the happiest effects." [38]

Wisconsin's Superintendent of Public Instruction, writing a few years later in 1858, reflected the attitude of his eastern colleagues, in that he regarded "with special favor the use of the Bible in public schools, as pre-eminently first in importance among text-books for teaching the noblest principles of virtue, morality, patriotism, and good order—love and reverence for God—charity and good will to man." [39]

Such statements reveal the understanding of educators that the daily religious exercises in the schools served broader goals than compelling formal worship of God or fostering church attendance. The religious aims of the educators who adopted and retained such exercises were comprehensive, and in many cases quite devoid of sectarian bias—but the crucial fact is that they were nonetheless religious. While it has been suggested, see pp. 278–281, *infra*, that daily prayer and reading of Scripture now serve secular goals as well, there can be no doubt that the origins of these practices were unambiguously religious, even where the educator's aim was not to win adherents to a particular creed or faith.

Almost from the beginning religious exercises in the public schools have been the subject of intense criticism, vigorous debate, and judicial or administrative prohibition. Significantly, educators and school boards

[38] Quoted from New Hampshire School Reports, 1850, 31–32, in Kinney, Church and State: The Struggle for Separation in New Hampshire, 1630–1900 (1955), 157–158.

[39] Quoted in Boyer, Religious Education of Public School Pupils in Wisconsin, 1953 Wis. L. Rev. 181, 186.

early entertained doubts about both the legality and the soundness of opening the school day with compulsory prayer or Bible reading. Particularly in the large Eastern cities, where immigration had exposed the public schools to religious diversities and conflicts unknown to the homogeneous academies of the eighteenth century, local authorities found it necessary even before the Civil War to seek an accommodation. In 1843, the Philadelphia School Board adopted the following resolutions:

> "RESOLVED, that no children be required to attend or unite in the reading of the Bible in the Public Schools, whose parents are conscientiously opposed thereto:
>
> "RESOLVED, that those children whose parents conscientiously prefer and desire any particular version of the Bible, without note or comment, be furnished with same." [40]

A decade later, the Superintendent of Schools of New York State issued an even bolder decree that prayers could no longer be required as part of public school activities, and that where the King James Bible was read, Catholic students could not be compelled to attend. [41] This type of accommodation was not restricted to the East Coast; the Cincinnati Board of Education resolved in 1869 that "religious instruction and the reading of religious books, including the Holy Bible, are prohibited in the common schools of Cincinnati, it being the true object and intent of this rule to allow the children of the parents of all sects and opinions, in matters of faith and worship,

---

[40] Quoted in Dunn, What Happened to Religious Education? (1958), 271.

[41] Quoted in Butts, The American Tradition in Religion and Education (1950), 135–136.

to enjoy alike the benefit of the common-school fund." [42]
The Board repealed at the same time an earlier regulation
which had required the singing of hymns and psalms to
accompany the Bible reading at the start of the school
day. And in 1889, one commentator ventured the view
that "[t]here is not enough to be gained from Bible read-
ing to justify the quarrel that has been raised over it." [43]

Thus a great deal of controversy over religion in the
public schools had preceded the debate over the Blaine
Amendment, precipitated by President Grant's insistence
that matters of religion should be left "to the family altar,
the church, and the private school, supported entirely by
private contributions." [44] There was ample precedent,
too, for Theodore Roosevelt's declaration that in the
interest of "absolutely nonsectarian public schools" it
was "not our business to have the Protestant Bible or the
Catholic Vulgate or the Talmud read in those schools." [45]
The same principle appeared in the message of an Ohio
Governor who vetoed a compulsory Bible-reading bill in
1925:

> "It is my belief that religious teaching in our
> homes, Sunday schools, churches, by the good

[42] See *Board of Education* v. *Minor,* 23 Ohio St. 211; Blakely,
American State Papers and Related Documents on Freedom in Re-
ligion (4th rev. ed. 1949), 864.

[43] Report of the United States Commissioner of Education for the
Year 1888–1889, part I, H. R. Exec. Doc. No. 1, part 5, 51st Cong., 1st
Sess. 627.

[44] Quoted in *Illinois ex rel. McCollum* v. *Board of Education,*
*supra,* at 218 (opinion of Frankfurter, J.). See also President
Grant's Annual Message to Congress, Dec. 7, 1875, 4 Cong. Rec. 175
*et seq.,* which apparently inspired the drafting and submission of
the Blaine Amendment. See Meyer, Comment, The Blaine Amend-
ment and the Bill of Rights, 64 Harv. L. Rev. 939 (1951).

[45] Theodore Roosevelt to Michael A. Schaap, Feb. 22, 1915, 8
Letters of Theodore Roosevelt (Morison ed. 1954), 893.

mothers, fathers, and ministers of Ohio is far preferable to compulsory teaching of religion by the state. The spirit of our federal and state constitutions from the beginning . . . [has] been to leave religious instruction to the discretion of parents." [46]

The same theme has recurred in the opinions of the Attorneys General of several States holding religious exercises or instruction to be in violation of the state or federal constitutional command of separation of church and state.[47] Thus the basic principle upon which our decision last year in *Engel* v. *Vitale* necessarily rested, and which we reaffirm today, can hardly be thought to be radical or novel.

Particularly relevant for our purposes are the decisions of the state courts on questions of religion in the public schools. Those decisions, while not, of course, authoritative in this Court, serve nevertheless to define the problem before us and to guide our inquiry. With the growth of religious diversity and the rise of vigorous dissent it was inevitable that the courts would be called upon to enjoin religious practices in the public schools which offended certain sects and groups. The earliest of such decisions declined to review the propriety of actions taken by school authorities, so long as those actions were within

[46] Quoted in Boles, The Bible, Religion, and the Public Schools (1961), 238.

[47] *E. g.*, 1955 Op. Ariz. Atty. Gen. 67; 26 Ore. Op. Atty. Gen. 46 (1952); 25 Cal. Op. Atty. Gen. 316 (1955); 1948–1950 Nev. Atty. Gen. Rep. 69 (1948). For a 1961 opinion of the Attorney General of Michigan to the same effect, see 63 American Jewish Yearbook (1962) 189. In addition to the Governor of Ohio, see note 46, *supra*, a Governor of Arizona vetoed a proposed law which would have permitted "reading the Bible, without comment, except to teach Historical or Literary facts." See 2 Stokes, Church and State in the United States (1950), 568.

the purview of the administrators' powers.[48] Thus, where the local school board *required* religious exercises, the courts would not enjoin them;[49] and where, as in at least one case, the school officials *forbade* devotional practices, the court refused on similar grounds to overrule that decision.[50] Thus, whichever way the early cases came up, the governing principle of nearly complete deference to administrative discretion effectively foreclosed any consideration of constitutional questions.

The last quarter of the nineteenth century found the courts beginning to question the constitutionality of public school religious exercises. The legal context was still, of course, that of the state constitutions, since the First Amendment had not yet been held applicable to state action. And the state constitutional prohibitions against church-state cooperation or governmental aid to religion were generally less rigorous than the Establishment Clause of the First Amendment. It is therefore remarkable that the courts of a half dozen States found compulsory religious exercises in the public schools in violation of their respective state constitutions.[51] These

---

[48] See Johnson and Yost, Separation of Church and State in the United States (1948), 71; Note, Bible Reading in Public Schools, 9 Vand. L. Rev. 849, 851 (1956).

[49] *E. g., Spiller* v. *Inhabitants of Woburn*, 12 Allen (Mass.) 127 (1866); *Donahoe* v. *Richards*, 38 Maine 376, 413 (1854); cf. *Ferriter* v. *Tyler*, 48 Vt. 444, 471–472 (1876).

[50] *Board of Education* v. *Minor*, 23 Ohio St. 211 (1873).

[51] *People ex rel. Ring* v. *Board of Education*, 245 Ill. 334, 92 N. E. 251 (1910); *Herold* v. *Parish Board of School Directors*, 136 La. 1034, 68 So. 116 (1915); *State ex rel. Weiss* v. *District Board*, 76 Wis. 177, 44 N. W. 967 (1890); *State ex rel. Finger* v. *Weedman*, 55 S. D. 343, 226 N. W. 348 (1929); *State ex rel. Dearle* v. *Frazier*, 102 Wash. 369, 173 P. 35 (1918); cf. *State ex rel. Clithero* v. *Showalter*, 159 Wash. 519, 293 P. 1000 (1930); *State ex rel. Freeman* v. *Scheve*, 65 Neb. 853, 91 N. W. 846 (1902), modified, 65 Neb. 876, 93

courts attributed much significance to the clearly religious origins and content of the challenged practices, and to the impossibility of avoiding sectarian controversy in their conduct. The Illinois Supreme Court expressed in 1910 the principles which characterized these decisions:

"The public school is supported by the taxes which each citizen, regardless of his religion or his lack of it, is compelled to pay. The school, like the government, is simply a civil institution. It is secular, and not religious, in its purposes. The truths of the Bible are the truths of religion, which do not come within the province of the public school. . . . No one denies that they should be taught to the youth of the State. The constitution and the law do not interfere with such teaching, but they do banish theological polemics from the schools and the school districts. This is done, not from any hostility to religion, but because it is no part of the duty of the State to teach religion,—to take the money of all and apply it to teaching the children of all the religion of a part, only. . Instruction in religion must be voluntary." *People ex rel. Ring* v. *Board of Education,* 245 Ill. 334, 349, 92 N. E. 251, 256 (1910).

The Supreme Court of South Dakota, in banning devotional exercises from the public schools of that State, also cautioned that "[t]he state as an educator must keep out of this field, and especially is this true in the common schools, where the child is immature, without fixed religious convictions ... ." *State ex rel. Finger* v. *Weedman,* 55 S. D. 343, 357, 226 N. W. 348, 354 (1929).

N. W. 169 (1903). The cases are discussed in Boles, The Bible, Religion, and the Public Schools (1961), c. IV; Harrison, The Bible, the Constitution and Public Education, 29 Tenn. L. Rev. 363, 386–389 (1962).

Even those state courts which have sustained devotional exercises under state law [52] have usually recognized the primarily religious character of prayers and Bible readings. If such practices were not for that reason unconstitutional, it was necessarily because the state constitution forbade only public expenditures for *sectarian* instruction, or for activities which made the schoolhouse a "place of. worship," but said nothing about the subtler question of laws "respecting an establishment of religion." [53]   Thus the panorama of history permits no

[52] *Moore* v. *Monroe,* 64 Iowa 367, 20 N. W. 475 (1884); *Hackett* v. *Brooksville Graded .School District,* 120 Ky. 608, 87 S. W. 792 (1905); *Billard* v. *Board of Education,* 69 Kan. 53, 76 P. 422 (1904); *Pfeiffer* v. *Board of Education,* 118 Mich. 560, 77 N. W. 250 (1898); *Kaplan* v. *School District,* 171 Minn. 142, 214 N. W. 18 (1927); *Lewis* v. *Board of Education,* 157 Misc. 520, 285 N. Y. Supp. 164 (Sup. Ct. 1935), modified on other grounds, 247 App. Div. 106, 286 N. Y. Supp. 174 (1936), appeal dismissed, 276 N. Y. 490, 12 N. E. 2d 172 (1937); *Doremus* v. *Board of Education,* 5 N. J. 435, 75 A. 2d 880 (1950), appeal dismissed, 342 U. S. 429; *Church* v. *Bullock,* 104 Tex. 1, 109 S. W. 115 (1908); *People ex rel. Vollmar* v. *Stanley,* 81 Colo. 276, 255 P. 610 (1927); *Wilkerson* v. *City of Rome,* 152 Ga. 762, 110 S. E. 895 (1922); *Carden* v. *Bland,* 199 Tenn. 665, 288 S. W. 2d 718 (1956); *Chamberlin* v. *Dade County Board of Public Instruction,* 143 So. 2d 21 (Fla. 1962).

[53] For discussion of the constitutional and statutory provisions involved in the state cases which sustained devotional exercises in the public schools, see Boles, The Bible, Religion, and the Public Schools (1961), c. III; Harrison, The Bible, the Constitution and Public Education, 29 Tenn. L. Rev. 363, 381–385 (1962); Fellman, Separation of Church and State in the United States: A Summary View, 1950 Wis.. L. Rev. 427, 450–452; Note, Bible Reading in Public Schools, 9 Vand. L. Rev. 849, 854–859 (1956); Note, Nineteenth Century Judicial Thought Concerning Church-State Relations, 40 Minn. L. Rev. 672, 675–678 (1956).   State courts appear to have been increasingly influenced in sustaining devotional practices by the availability of an excuse or exemption for dissenting students.   See Cushman, The Holy Bible and the Public Schools, 40 Cornell L. Q. 475, 477 (1955); 13 Vand. L. Rev. 552 (1960).

other conclusion than that daily prayers and Bible readings in the public schools have always been designed to be, and have been regarded as, essentially religious exercises. Unlike the Sunday closing laws, these exércises appear neither to have been divorced from their religious origins nor deprived of their centrally religious character by the passage of time,[54] cf. *McGowan* v. *Marÿland, supra,* at 442–445. On this distinction alone we might well rest a constitutional decision. But three further contentions have been pressed in the argument of these cases. These contentions deserve careful consideration, for if the position of the school authorities were correct in respect to any of them, we would be misapplying the principles of *Engel* v. *Vitale.*

## A.

First, it is argued that however clearly religious may have been the origins and early nature of daily prayer and Bible reading, these practices today serve so clearly secular educational purposes that their religious attributes may be overlooked. I do not doubt, for example, that morning devotional exercises may foster better discipline in the classroom, and elevate the spiritual level on which the school day opens. The Pennsylvania Superintendent of Public Instruction, testifying by deposition in the *Schempp* case, offered his view that daily Bible reading "places upon the children or those hearing the reading of this, and the atmosphere which goes on in the reading . . . one of the last vestiges of moral value

---

[54] See Rosenfield, Separation of Church and State in the Public Schools, 22 U. of Pitt. L. Rev. 561, 571–572 (1961); Harrison, The Bible, the Constitution and Public Education, 29 Tenn. L. Rev. 363, 399–400 (1962); 30 Ford. L. Rev. 801, 803 (1962); 45 Va. L. Rev. 1381 (1959). The essentially religious character of the materials used in these exercises is, in fact, strongly suggested by the presence of excusal or exemption provisions, and by the practice of rotating or alternating the use of different prayers and versions of the Holy Bible.

that we have left in our school system." The exercise thus affords, the Superintendent concluded, "a strong contradiction to the materialistic trends of our time." Baltimore's Superintendent of Schools expressed a similar view of the practices challenged in the *Murray* case, to the effect that "[t]he acknowledgement of the existence of God as symbolized in the opening exercises establishes a discipline tone which tends to cause each individual pupil to constrain his overt acts and to consequently conform to accepted standards of behavior during his attendance at school." These views are by no means novel, see, e. g., *Billard* v. *Board of Education*, 69 Kan. 53, 57–58, 76 P. 422, 423 (1904).[55]

It is not the business of this Court to gainsay the judgments of experts on matters of pedagogy. Such decisions must be left to the discretion of those administrators charged with the supervision of the Nation's public schools. The limited province of the courts is to determine whether the means which the educators have chosen to achieve legitimate pedagogical ends infringe the constitutional freedoms of the First Amendment. The secular purposes which devotional exercises are said to serve fall into two categories—those which depend upon an immediately religious experience shared by the participating children; and those which appear sufficiently divorced from the religious content of the devotional material that they can be served equally by nonreligious

---

[55] In the *Billard* case, the teacher whose use of the Lord's Prayer and the Twenty-third Psalm was before the court testified that the exercise served disciplinary rather than spiritual purposes:

"It is necessary to have some general exercise after the children come in from the playground to prepare them for their work. You need some general exercise to quiet them down."

When asked again if the purpose were not at least partially religious, the teacher replied, "[i]t was religious to the children that are religious, and to the others it was not." 69 Kan., at 57–58, 76 P., at 423.

materials.  With respect to the first objective, much has
been written about the moral and spiritual values of
infusing some religious influence or instruction into the
public school classroom.[56]  To the extent that only *reli-*
*gious* materials will serve this purpose, it seems to me
that the purpose as well as the means is so plainly religious
that the exercise is necessarily forbidden by the Estab-
lishment Clause.  The fact that purely secular benefits
may eventually result does not seem to me to justify the
exercises, for similar indirect nonreligious benefits could
no doubt have been claimed for the released time program
invalidated in *McCollum.*

The second justification assumes that religious exer-
cises at the start of the school day may directly serve
solely secular ends—for example, by fostering harmony
and tolerance among the pupils, enhancing the authority
of the teacher, and inspiring better discipline.  To the
extent that such benefits result not from the content of
the readings and recitation, but simply from the holding
of such a solemn exercise at the opening assembly or
the first class of the day, it would seem that less sensi-
tive materials might equally well serve the same purpose.
I have previously suggested that *Torcaso* and the *Sunday*
*Law Cases* forbid the use of religious means to achieve sec-

---

[56] See, *e. g.*, Henry, The Place of Religion in Public Schools
(1950); Martin, Our Public Schools—Christian or Secular (1952);
Educational Policies Comm'n of the National Educational Assn.,
Moral and Spiritual Values in the Public Schools (1951), c. IV; Har-
ner, Religion's Place in General Education (1949).  Educators are
by no means unanimous, however, on this question.  See Boles, The
Bible, Religion, and the Public Schools (1961), 223–224.  Compare
George Washington's advice in his Farewell Address:
"And let us with caution indulge the supposition, that morality can
be maintained without religion.  Whatever may be conceded to the
influence of refined education on minds of peculiar structure, reason
and experience both forbid us to expect that National morality can
prevail in exclusion of religious principle." 35 Writings of George
Washington (Fitzpatrick ed. 1940), 229.

ular ends where nonreligious means will suffice. That principle is readily applied to these cases. It has not been shown that readings from the speeches and messages of great Americans, for example, or from the documents of our heritage of liberty, daily recitation of the Pledge of Allegiance, or even the observance of a moment of reverent silence at the opening of class, may not adequately serve the solely secular purposes of the devotional activities without jeopardizing either the religious liberties of any members of the community or the proper degree of separation between the spheres of religion and government.[57] Such substitutes would, I think, be unsatisfactory or inadequate only to the extent that the present activities do in fact serve religious goals. While I do not question the judgment of experienced educators that the challenged practices may well achieve valuable secular ends, it seems to me that the State acts unconstitutionally if it either sets about to attain even indirectly religious ends by religious means, or if it uses religious means to serve secular ends where secular means would suffice.

## B.

Second, it is argued that the particular practices involved in the two cases before us are unobjectionable

---

[57] Thomas Jefferson's insistence that where the judgments of young children "are not sufficiently matured for religious inquiries, their memories may here be stored with the most useful facts from Grecian, Roman, European and American history," 2 Writings of Thomas Jefferson (Memorial ed. 1903), 204, is relevant here. Recent proposals have explored the possibility of commencing the school day "with a quiet moment that would still the tumult of the playground and start a day of study," Editorial, Washington Post, June 28, 1962, § A, p. 22, col. 2. See also New York Times, Aug. 30, 1962, § 1, p. 18, col. 2. For a consideration of these and other alternative proposals see Choper, Religion in the Public Schools: A Proposed Constitutional Standard, 47 Minn. L. Rev. 329, 370–371 (1963). See also 2 Stokes, Church and State in the United States (1950), 571.

because they prefer no particular sect or sects at the expense of others. Both the Baltimore and Abington procedures permit, for example, the reading of any of several versions of the Bible, and this flexibility is said to ensure neutrality sufficiently to avoid the constitutional prohibition. One answer, which might be dispositive, is that any version of the Bible is inherently sectarian, else there would be no need to offer a system of rotation or alternation of versions in the first place, that is, to allow different sectarian versions to be used on different days. The sectarian character of the Holy Bible has been at the core of the whole controversy over religious practices in the public schools throughout its long and often bitter history.[58]    To

---

[58] The history, as it bears particularly upon the role of sectarian differences concerning Biblical texts and interpretation, has been summarized in *Tudor* v. *Board of Education,* 14 N. J. 31, 36–44, 100 A. 2d 857, 859–864. See also *State ex rel. Weiss* v. *District Board,* 76 Wis. 177, 190–193, 44 N. W. 967, 972–975. One state court adverted to these differences a half century ago:

"The Bible, in its entirety, is a sectarian book as to the Jew and every believer in any religion other than the Christian religion, and as to those who are heretical or who hold beliefs that are not regarded as orthodox . . . its use in the schools necessarily results in sectarian instruction. There are many sects of Christians, and their differences grow out of their differing constructions of various parts of the Scriptures—the different conclusions drawn as to the effect of the same words. The portions of Scripture which form the basis of these sectarian differences cannot be thoughtfully and intelligently read without impressing the reader, favorably or otherwise, with reference to the doctrines supposed to be derived from them." *People ex rel. Ring* v. *Board of Education,* 245 Ill. 334, 347–348, 92 N. E. 251, 255. But see, for a sharply critical comment, Schofield, Religious Liberty and Bible Reading in Illinois Public Schools, 6 Ill. L. Rev. 17 (1911).

See also Dunn, What Happened to Religious Education? (1958), 268–273; Dawson, America's Way in Church, State, and Society (1953), 53–54; Johnson and Yost, Separation of Church and State in the United States (1948), c. IV; Harpster, Religion, Education and

vary the version as the Abington and Baltimore schools have done may well be less offensive than to read from the King James version every day, as once was the practice. But the result even of this relatively benign procedure is that majority sects are preferred in approximate proportion to their representation in the community and in the student body, while the smaller sects suffer commensurate discrimination. So long as the subject matter of the exercise is sectarian in character, these consequences cannot be avoided.

The argument contains, however, a more basic flaw. There are persons in every community—often deeply devout—to whom any version of the Judaeo-Christian Bible is offensive.[59] There are others whose reverence for the Holy Scriptures demands private study or reflection and to whom public reading or recitation is sacrilegious, as one of the expert witnesses at the trial of the *Schempp* case explained. To such persons it is not the fact of using the Bible in the public schools, nor the content of any particular version, that is offensive, but only the *manner* in

the Law, 36 Marquette L. Rev. 24, 44–45 (1952); 20 Ohio State L. J. 701, 702–703 (1959).

[59] See *Torcaso* v. *Watkins, supra,* at 495, n. 11; Cushman, The Holy Bible and the Public Schools, 40 Cornell L. Q. 475, 480–483 (1955); Note, Separation of Church and State: Religious Exercises in the Schools, 31 U. of Cinc. L. Rev. 408, 411–412 (1962). Few religious persons today would share the universality of the Biblical canons of John Quincy Adams:

"You ask me *what* Bible I take as the standard of my faith—the Hebrew, the Samaritan, the old English translation, or what? I answer, the Bible containing the sermon upon the mount—any Bible that I can read and understand. . . . I take any one of them for my standard of faith. If Socinus or Priestley had made a fair *translation* of the Bible, I would have taken that, but without their comments." John Quincy Adams to John Adams, Jan. 3, 1817, in Koch and Peden, Selected Writings of John and John Quincy Adams (1946), 292.

which it is used.[60] For such persons, the anathema of public communion is even more pronounced when prayer is involved. Many deeply devout persons have always regarded prayer as a necessarily private experience.[61] One Protestant group recently commented, for example: "When one thinks of prayer as sincere outreach of a

---

[60] Rabbi Solomon Grayzel testified before the District Court, "In Judaism the Bible is not read, it is studied. There is no special virtue attached to a mere reading of the Bible; there is a great deal of virtue attached to a study of the Bible." See Boles, The Bible, Religion, and the Public Schools (1961), 208–218; Choper, Religion in the Public Schools: A Proposed Constitutional Standard, 47 Minn. L. Rev. 329, 372–375 (1963). One religious periodical has suggested the danger that "an observance of this sort is likely to deteriorate quickly into an empty formality with little, if any, spiritual significance. Prescribed forms of this sort, as many colleges have concluded after years of compulsory chapel attendance, can actually work against the inculcation of vital religion." Prayers in Public Schools Opposed, 69 Christian Century, Jan. 9, 1952, p. 35.

[61] See Cahn, On Government and Prayer, 37 N. Y. U. L. Rev. 981, 993–994 (1962). A leading Protestant journal recently noted:

"Agitation for removal of religious practices in public schools is not prompted or supported entirely by Jews, humanists, and atheists. At both local and national levels, many Christian leaders, concerned both for civil rights of minorities and for adequate religious education, are opposed to religious exercises in public schools. . . . Many persons, both Jews and Christians, believe that prayer and Bible reading are too sacred to be permitted in public schools in spite of their possible moral value." Smith, The Religious Crisis In Our Schools, 128 The Episcopalian, May 1963, pp. 12–13. See, e. g., for other recent statements on this question, Editorial, Amending the Amendment, 108 America, May 25, 1963, p. 736; Sissel, A Christian View: Behind the Fight Against School Prayer, 27 Look, June 18, 1963, p. 25.

It should be unnecessary to demonstrate that the Lord's Prayer, more clearly than the Regents' Prayer involved in Engel v. Vitale, is an essentially Christian supplication. See, e. g., Scott, The Lord's Prayer: Its Character, Purpose, and Interpretation (1951), 55; Buttrick, So We Believe, So We Pray (1951), 142; Levy, Lord's Prayer, in 7 Universal Jewish Encyclopedia (1948), 192–193.

human soul to the Creator, 'required prayer' becomes an absurdity." [62]    There is a similar problem with respect to comment upon the passages of Scripture which are to be read.    Most present statutes forbid comment, and this practice accords with the views of many religious groups as to the manner in which the Bible should be read. However, as a recent survey discloses, scriptural passages read without comment frequently convey no message to the younger children in the school.    Thus there has developed a practice in some schools of bridging the gap between faith and understanding by means of "definitions," even where "comment" is forbidden by statute.[63] The present practice therefore poses a difficult dilemma: While Bible reading is almost universally required to be without comment, since only by such a prohibition can sectarian interpretation be excluded from the classroom,

[62] Statement of the Baptist Joint Committee on Public Affairs, in 4 J. Church and State 144 (1962).

[63] See Harrison, The Bible, the Constitution and Public Education, 29 Tenn. L. Rev. 363, 397 (1962).    The application of statutes and regulations which forbid comment on scriptural passages is further complicated by the view of certain religious groups that reading without comment is either meaningless or actually offensive.    Compare Rabbi Grayzel's testimony before the District Court that "the Bible is misunderstood when it is taken without explanation."    A recent survey of the attitudes of certain teachers disclosed concern that "refusal to answer pupil questions regarding any curricular activity is not educationally sound," and that reading without comment might create in the minds of the pupils the impression that something was "hidden or wrong."    Boles, The Bible, Religion, and the Public Schools (1961), 235–236.    Compare the comment of a foreign observer: "In no other field of learning would we expect a child to draw the full meaning from what he reads without accompanying explanatory comment.    But comment by the teacher will inevitably reveal his own personal preferences; and the exhibition of preferences is what we are seeking to eliminate." · MacKinnon, Freedom?—or Toleration? The Problem of Church and State in the United States, [1959] Pub. Law 374, 383.

the rule breaks down at the point at which rudimentary definitions of Biblical terms are necessary for comprehension if the exercise is to be meaningful at all.

It has been suggested that a tentative solution to these problems may lie in the fashioning of a "common core" of theology tolerable to all creeds but preferential to none.[64] But as one commentator has recently observed, "[h]istory is not encouraging to" those who hope to fashion a "common denominator of religion detached from its manifestation in any organized church." Sutherland, Establishment According to *Engel*, 76 Harv. L. Rev. 25, 51 (1962). Thus, the notion of a "common core" litany or supplication offends many deeply devout worshippers who do not find clearly sectarian practices objectionable.[65] Father Gustave Weigel has recently expressed

---

[64] See Abbott, A Common Bible Reader for Public Schools, 56 Religious Education 20 (1961); Note, 22 Albany L. Rev. 156–157 (1958); 2 Stokes, Church and State in the United States (1950), 501–506 (describing the "common denominator" or "three faiths" plan and certain programs of instruction designed to implement the "common core" approach). The attempts to evolve a universal, nondenominational prayer are by no means novel. See, *e. g.*, Madison's letter to Edward Everett, March 19, 1823, commenting upon a "project of a prayer . . . intended to comprehend & conciliate College Students of every [Christian] denomination, by a Form composed wholly of texts & phrases of scripture." 9 Writings of James Madison (Hunt ed. 1910), 126. For a fuller description of this and other attempts to fashion a "common core" or nonsectarian exercise, see *Engel* v. *Vitale*, 18 Misc. 2d 659, 660–662, 191 N. Y. S. 2d 453, 459–460.

[65] See the policy statement recently drafted by the National Council of the Churches of Christ: ". . . neither true religion nor good education is dependent upon the devotional use of the Bible in the public school program. . . . Apart from the constitutional questions involved, attempts to establish a 'common core' of religious beliefs to be taught in public schools for the purpose of indoctrination are unrealistic and unwise. Major faith groups have not agreed on a formulation of religious beliefs common to all. Even if they had

a widely shared view: "The moral code held by each separate religious community can reductively be unified, but the consistent particular believer wants no such reduction." [66] And, as the American Council on Education warned several years ago, "The notion of a common core suggests a watering down of the several faiths to the point where common essentials appear. This might easily lead to a new sect—a public school sect—which would take its place alongside the existing faiths and compete with them." [67] *Engel* is surely authority that nonsectarian religious practices, equally with sectarian exercises, violate the Establishment Clause. Moreover, even if the Establishment Clause were oblivious to nonsectarian religious practices, I think it quite likely that the "common core" approach would be sufficiently objectionable to many groups to be foreclosed by the prohibitions of the Free Exercise Clause.

## C.

A third element which is said to absolve the practices involved in these cases from the ban of the religious guarantees of the Constitution is the provision to excuse or exempt students who wish not to participate. Insofar as these practices are claimed to violate the Establishment

---

done so, such a body of religious doctrine would tend to become a substitute for the more demanding commitments of historic faiths." Washington Post, May 25, 1963, § A, p. 1, col. 4. See also Choper, Religion in the Public Schools: A Proposed Constitutional Standard, 47 Minn. L. Rev. 329, 341, 368–369 (1963). See also Hartford, Moral Values in Public Education: Lessons from the Kentucky Experience (1958), 261–262; Moehlman, The Wall of Separation Between Church and State (1951), 158–159. Cf. Mosk, "Establishment Clause" Clarified, 22 Law in Transition 231, 235–236 (1963).

[66] Quoted in Kurland, The Regents' Prayer Case: "Full of Sound and Fury, Signifying . . . ," 1962 Supreme Court Review (1962), 1, 31.

[67] Quoted in Harrison, The Bible, the Constitution and Public Education, 29 Tenn. L. Rev. 363, 417 (1962). See also Dawson, America's Way in Church, State, and Society (1953), 54.

Clause, I find the answer which the District Court gave after our remand of *Schempp* to be altogether dispositive:

> "The fact that some pupils, or theoretically all pupils, might be excused from attendance at the exercises does not mitigate the obligatory nature of the ceremony . . . . The exercises are held in the school buildings and perforce are conducted by and under the authority of the local school authorities and during school sessions. Since the statute requires the reading of the 'Holy Bible,' a Christian document, the practice, as we said in our first opinion, prefers the Christian religion. The record demonstrates that it was the intention of the General Assembly of the Commonwealth of Pennsylvania to introduce a religious ceremony into the public schools of the Commonwealth." 201 F. Supp., at 819.

Thus the short, and to me sufficient, answer is that the availability of excusal or exemption simply has no relevance to the establishment question, if it is once found that these practices are essentially. religious exercises designed at least in part to achieve religious aims through the use of public school facilities during the school day.

The more difficult question, however, is whether the availability of excusal for the dissenting child serves to refute challenges to these practices under the Free Exercise Clause. While it is enough to decide these cases to dispose of the establishment questions, questions of free exercise are so inextricably interwoven into the history and present status of these practices as to justify disposition of this second aspect of the excusal issue. The answer is that the excusal procedure itself necessarily operates in such a way as to infringe the rights of free exercise of those children who wish to be excused. We have held in *Barnette* and *Torcaso*, respectively, that a State may require neither public school students nor candidates

for an office of public trust to profess beliefs offensive to religious principles. By the same token the State could not constitutionally require a student to profess publicly his disbelief as the prerequisite to the exercise of his constitutional right of abstention. And apart from *Torcaso* and *Barnette,* I think *Speiser* v. *Randall,* 357 U. S. 513, suggests a further answer. We held there that a State may not condition the grant of a tax exemption upon the willingness of those entitled to the exemption to affirm their loyalty to the Government, even though the exemption was itself a matter of grace rather than of constitutional right. We concluded that to impose upon the eligible taxpayers the affirmative burden of proving their loyalty impermissibly jeopardized the freedom to engage in constitutionally protected activities close to the area to which the loyalty oath related. *Speiser* v. *Randall* seems to me to dispose of two aspects of the excusal or exemption procedure now before us. First, by requiring what is tantamount in the eyes of teachers and schoolmates to a profession of disbelief, or at least of nonconformity, the procedure may well deter those children who do not wish to participate for any reason based upon the dictates of conscience from exercising an indisputably constitutional right to be excused.[68] Thus the excusal

---

[68] See the testimony of Edward L. Schempp, the father of the children in the Abington schools and plaintiff-appellee in No. 142, concerning his reasons for not asking that his children be excused from the morning exercises after excusal was made available through amendment of the statute:

"We originally objected to our children being exposed to the reading of the King James version of the Bible . . . and under those conditions we would have theoretically liked to have had the children excused. But we felt that the penalty of having our children labelled as 'odd balls' before their teachers and classmates every day in the year was even less satisfactory than the other problem. . . .

"The children, the classmates of Roger and Donna are very liable to label and lump all particular religious difference or religious objec-

provision in its operation subjects them to a cruel dilemma. In consequence, even devout children may well avoid claiming their right and simply continue to participate in exercises distasteful to them because of an understandable reluctance to be stigmatized as atheists or nonconformists simply on the basis of their request.

Such reluctance to seek exemption seems all the more likely in view of the fact that children are disinclined at this age to step out of line or to flout "peer-group norms." Such is the widely held view of experts who have studied the behaviors and attitudes of children.[69] This is also

tions as atheism, particularly, today the word 'atheism' is so often tied to atheistic communism, and atheism has very bad connotations in the minds of children and many adults today."

A recent opinion of the Attorney General of California gave as one reason for finding devotional exercises unconstitutional the likelihood that "[c]hildren forced by conscience to leave the room during such exercises would be placed in a position inferior to that of students adhering to the State-endorsed religion." 25 Cal. Op. Atty. Gen. 316, 319 (1955). Other views on this question, and possible effects of the excusal procedure, are summarized in Rosenfield, Separation of Church and State in the Public Schools, 22 U. of Pitt. L. Rev. 561, 581–585 (1961); Note, Separation of Church and State: Religious Exercises in the Schools, 31 U. of Cinc. L. Rev. 408, 416 (1962); Note, 62 W. Va. L. Rev. 353, 358 (1960).

[69] Extensive testimony by behavioral scientists concerning the effect of similar practices upon children's attitudes and behaviors is discussed in *Tudor* v. *Board of Education*, 14 N. J. 31, 50–52, 100 A. 2d 857, 867–868. See also Choper, Religion in the Public Schools: A Proposed Constitutional Standard, 47 Minn. L. Rev. 329, 344 (1963). There appear to be no reported experiments which bear directly upon the question under consideration. There have, however, been numerous experiments which indicate the susceptibility of school children to peer-group pressures, especially where important group norms and values are involved. See, *e. g.*, Berenda, The Influence of the Group on the Judgments of Children (1950), 26–33; Argyle, Social Pressure in Public and Private Situations, 54 J. Abnormal & Social Psych. 172 (1957); cf. Rhine, The Effect of Peer

the basis of Mr. Justice Frankfurter's answer to a similar contention made in the *McCollum* case:

"That a child is offered an alternative may reduce the constraint; it does not eliminate the operation of influence by the school in matters sacred to conscience and outside the school's domain. The law of imitation operates, and non-conformity is not an

Group Influence Upon Concept-Attitude Development and Change, 51 J. Social Psych. 173 (1960); French, Morrison and Levinger, Coercive Power and Forces Affecting Conformity, 61 J. Abnormal and Social Psych. 93 (1960). For a recent and important experimental study of the susceptibility of students to various factors in the school environment, see Zander, Curtis and Rosenfeld, The Influence of Teachers and Peers on Aspirations of Youth (U. S. Office of Education Cooperative Research Project No. 451, 1961), 24–25, 78–79. It is also apparent that the susceptibility of school children to prestige suggestion and social influence within the school environment varies inversely with the age, grade level, and consequent degree of sophistication of the child, see Patel and Gordon, Some Personal and Situational Determinants of Yielding to Influence, 61 J. Abnormal and Social Psych. 411, 417 (1960).

Experimental findings also shed some light upon the probable effectiveness of a provision for excusal when, as is usually the case, the percentage of the class wishing not to participate in the exercises is very small. It has been demonstrated, for example, that the inclination even of adults to depart or dissent overtly from strong group norms varies proportionately with the size of the dissenting group—that is, inversely with the apparent or perceived strength of the norm itself—and is markedly slighter in the case of the sole or isolated dissenter. See, e. g., Asch, Studies of Independence and Conformity: I. A Minority of One Against a Unanimous Majority (Psych. Monographs No. 416, 1956), 69–70; Asch, Effects of Group Pressure upon the Modification and Distortion of Judgments, in Cartwright and Zander, Group Dynamics (2d ed. 1960), 189–199; Luchins and Luchins, On Conformity With True and False Communications, 42 J. Social Psych. 283 (1955). Recent important findings on these questions are summarized in Hare, Handbook of Small Group Research (1962), c. II.

outstanding characteristic of children. The result is an obvious pressure upon children to attend." 333 U. S., at 227.

Also apposite is the answer given more than 70 years ago by the Supreme Court of Wisconsin to the argument that an excusal provision saved a public school devotional exercise from constitutional invalidation:

". . . the excluded pupil loses caste with his fellows, and is liable to be regarded with aversion, and subjected to reproach and insult. But it is a sufficient refutation of the argument that the practice in question tends to destroy the equality of the pupils which the constitution seeks to establish and protect, and puts a portion of them to serious disadvantage in many ways with respect to the others." *State ex rel. Weiss* v. *District Board of School District No. 8,* 76 Wis. 177, 200, 44 N. W. 967, 975.

And 50 years ago a like answer was offered by the Louisiana Supreme Court:

"Under such circumstances, the children would be excused from the opening exercises . . . because of their religious beliefs. And excusing such children on religious grounds, although the number excused might be very small, would be a distinct preference in favor of the religious beliefs of the majority, and would work a discrimination against those who were excused. The exclusion of a pupil under such circumstances puts him in a class by himself; it subjects him to a religious stigma; and all because of his religious belief. Equality in public education would be destroyed by such act, under a Constitution which seeks to establish equality and freedom in religious matters." *Herold* v. *Parish Board of School Directors,* 136 La. 1034, 1049–1050, 68 So. 116, 121. See also *Tudor* v. *Board of Education,* 14 N. J. 31, 48–52,

100 A. 2d 857, 867–868; *Brown* v. *Orange County Board of Public Instruction,* 128 So. 2d 181, 185 (Fla. App.).

*Speiser* v. *Randall* also suggests the answer to a further argument based on the excusal procedure. It has been suggested by the School Board, in *Schempp,* that we ought not pass upon the appellees' constitutional challenge at least until the children have availed themselves of the excusal procedure and found it inadequate to redress their grievances. Were the right to be excused not itself of constitutional stature, I might have some doubt about this issue. But we held in *Speiser* that the constitutional vice of the loyalty oath procedure discharged any obligation to seek the exemption before challenging the constitutionality of the conditions upon which it might have been denied. 357 U. S., at 529. Similarly, we have held that one need not apply for a permit to distribute constitutionally protected literature, *Lovell* v. *Griffin,* 303 U. S. 444, or to deliver a speech, *Thomas* v. *Collins,* 323 U. S. 516, before he may attack the constitutionality of a licensing system of which the defect is patent. Insofar as these cases implicate only questions of establishment, it seems to me that the availability of an excuse is constitutionally irrelevant. Moreover, the excusal procedure seems to me to operate in such a way as to discourage the free exercise of religion on the part of those who might wish to utilize it, thereby rendering it unconstitutional in an additional and quite distinct respect.

To summarize my views concerning the merits of these two cases: The history, the purpose and the operation of the daily prayer recital and Bible reading leave no doubt that these practices standing by themselves constitute an impermissible breach of the Establishment Clause. Such devotional exercises may well serve legitimate nonreligious purposes. To the extent, however, that such pur-

poses are really without religious significance, it has never been demonstrated that secular means would not suffice. Indeed, I would suggest that patriotic or other nonreligious materials might provide adequate substitutes— inadequate only to the extent that the purposes now served are indeed directly or indirectly religious. Under such circumstances, the States may not employ religious means to reach a secular goal unless secular means are wholly unavailing. I therefore agree with the Court that the judgment in *Schempp*, No. 142, must be affirmed, and that in *Murray*, No. 119, must be reversed.

## V.

These considerations bring me to a final contention of the school officials in these cases: that the invalidation of the exercises at bar permits this Court no alternative but to declare unconstitutional every vestige, however slight, of cooperation or accommodation between religion and government. I cannot accept that contention. While it is not, of course, appropriate for this Court to decide questions not presently before it, I venture to suggest that religious exercises in the public schools present a unique problem. For not every involvement of religion in public life violates the Establishment Clause. Our decision in these cases does not clearly forecast anything about the constitutionality of other types of interdependence between religious and other public institutions.

Specifically, I believe that the line we must draw between the permissible and the impermissible is one which accords with history and faithfully reflects the understanding of the Founding Fathers. It is a line which the Court has consistently sought to mark in its decisions expounding the religious guarantees of the First Amendment. What the Framers meant to foreclose, and what our decisions under the Establishment Clause have for-

bidden, are those involvements of religious with secular institutions which (a) serve the essentially religious activities of religious institutions; (b) employ the organs of government for essentially religious purposes; or (c) use essentially religious means to serve governmental ends, where secular means would suffice. When the secular and religious institutions become involved in such a manner, there inhere in the relationship precisely those dangers—as much to church as to state—which the Framers feared would subvert religious liberty and the strength of a system of secular government. On the other hand, there may be myriad forms of involvements of government with religion which do not import such dangers and therefore should not, in my judgment, be deemed to violate the Establishment Clause. Nothing in the Constitution compels the organs of government to be blind to what everyone else perceives—that religious differences among Americans have important and pervasive implications for our society. Likewise nothing in the Establishment Clause forbids the application of legislation having purely secular ends in such a way as to alleviate burdens upon the free exercise of an individual's religious beliefs. Surely the Framers would never have understood that such a construction sanctions that involvement which violates the Establishment Clause. Such a conclusion can be, reached, I would suggest, only by using the words of the First Amendment to defeat its very purpose.

The line between permissible and impermissible forms of involvement between government and religion has already been considered by the lower federal and state courts. I think a brief survey of certain of these forms of accommodation will reveal that the First Amendment commands not official hostility toward religion, but only a strict neutrality in matters of religion. Moreover, it may serve to suggest that the scope of our holding today

is to be measured by the special circumstances under which these cases have arisen, and by the particular dangers to church and state which religious exercises in the public schools present. It may be helpful for purposes of analysis to group these other practices and forms of accommodation into several rough categories.

A. *The Conflict Between Establishment and Free Exercise.*—There are certain practices, conceivably violative of the Establishment Clause, the striking down of which might seriously interfere with certain religious liberties also protected by the First Amendment.[70] Provisions for churches and chaplains at military establishments for those in the armed services may afford one such example.[71]

---

[70] See, on the general problem of conflict and accommodation between the two clauses, Katz, Freedom of Religion and State Neutrality, 20 U. of Chi. L. Rev. 426, 429 (1953); Griswold, Absolute Is In the Dark, 8 Utah L. Rev. 167, 176–179 (1963); Kauper, Church, State, and Freedom: A Review, 52 Mich. L. Rev. 829, 833 (1954). One author has suggested that the Establishment and Free Exercise Clauses must be "read as stating a single precept: that government cannot utilize religion as a standard for action or inaction because these clauses, read together as they should be, prohibit classification in terms of religion either to confer a benefit or to impose a burden." Kurland, Religion and the Law (1962), 112. Compare the formula of accommodation embodied in the Australian Constitution, § 116:

"The Commonwealth shall not make any law for establishing any religion, or for imposing any religious observance, or for prohibiting the free exercise of any religion, and no religious test shall be required as a qualification for any office or public trust under the Commonwealth." Essays on the Australian Constitution (Else-Mitchell ed. 1961), 15.

[71] There has been much difference of opinion throughout American history concerning the advisability of furnishing chaplains at government expense. Compare, *e. g.*, Washington's order regarding chaplains for the Continental Army, July 9, 1776, in 5 Writings of George Washington (Fitzpatrick ed. 1932), 244, with Madison's views on a very similar question, letter to Edward Livingston, July 10, 1822, 9 Writings of James Madison (Hunt ed. 1910), 100–

The like provision by state and federal governments for chaplains in penal institutions·may afford another example.[72] It is argued that such provisions may be assumed to contravene the Establishment Clause, yet be sustained on constitutional grounds as necessary to secure to the members of the Armed Forces and prisoners those rights of worship guaranteed under the Free Exercise Clause. Since government has deprived such persons of the oppor-

---

103. Compare also ·this statement by the Armed Forces Chaplains Board concerning the chaplain's obligation:

"To us has been entrusted the spiritual and moral guidance of the young men and women in the Armed Services of this country. A chaplain has many duties—yet, first and foremost is that of presenting God to men and women wearing the military uniform. What happens to them while they are in military service has a profound effect on what happens in the community as they resume civilian life. We, as chaplains, must take full cognizance of that fact and dedicate our work to making them finer, spiritually strengthened citizens." Builders of Faith (U. S. Department of Defense 1955), ii. It is interesting to compare in this regard an express provision, Article 140, of the Weimar Constitution: "Necessary free time shall be accorded to the members of the armed forces for the fulfilment of their religious duties." McBain and Rogers, The New Constitutions of Europe (1922), 203.

[72] For a discussion of some recent and difficult problems in connection with chaplains and religious exercises in prisons, see, e. g., Pierce v. La Vallee, 293 F. 2d 233; In re Ferguson, 55 Cal. 2d 663, 361 P. 2d 417; McBride v. McCorkle, 44 N. J. Super. 468, 130 A. 2d 881; Brown v. McGinnis, 10 N. Y. 2d 531, 180 N. E. 2d 791; discussed in Comment, 62 Col. L. Rev. 1488 (1962); 75 Harv. L. Rev. 837 (1962). Compare Article XVIII of the Hague Convention Regulations of 1899:

"Prisoners of war shall enjoy every latitude in the exercise of their religion, including attendance ·at their own church services, provided only they comply with the regulations for order and police issued by the military authorities." Quoted in Blakely, American State Papers and Related Documents on Freedom in Religion (4th rev. ed. 1949), 313.

tunity·to practice their faith at places of their choice, the argument runs, government may, in order to avoid infringing the free exercise guarantees, provide substitutes where it requires such persons to be. Such a principle might support, for example, the constitutionality of draft exemptions for ministers and divinity students,[73]·cf. *Selective Draft Law Cases*, 245 U. S. 366, 389–390; of the excusal of children from school on their respective religious holidays; and of the allowance by government of temporary use of public buildings by religious organizations when their own churches have·become unavailable because of a disaster or emergency.[74]

Such activities and practices seem distinguishable from the sponsorship of daily Bible reading and prayer recital. For one thing, there is no element of coercion present in the appointment of military or prison chaplains; the soldier or convict who declines the opportunities for worship would not ordinarily subject himself to the suspicion or obloquy of his peers. Of special significance to this distinction is the fact that we are here usually deal-

---

[73] Compare generally Sibley and Jacob, Conscription of Conscience: The American State and the Conscientious Objector, 1940–1947 (1952), with Conklin, Conscientious Objector Provisions: A View in the Light of *Torcaso v. Watkins*, 51 Geo. L. J. 252 (1963).

[74] See, *e. g., Southside Estates Baptist Church* v. *Board of Trustees*, ·115 So. 2d 697 (Fla.) ; *Lewis* v. *Mandeville*, 201 Misc. 120, 107 N. Y. S. 2d 865; cf. *School District No. 97* v. *Schmidt*, 128 Colo. 495, 263 P. 2d 581 (temporary loan of school district's custodian to church). A different problem may be presented with respect to the regular use of public school property for religious activities, *State ex rel. Gilbert* v. *Dilley*, 95 Neb. 527, 145 N. W. 999; the erection on public property of a statue of or memorial to an essentially religious figure, *State ex rel. Singelmann* v. *Morrison*, 57 So. 2d 238 (La. App.) ; seasonal displays of a religious character, *Baer* v: *Kolmorgen*, 14 Misc. 2d 1015, 181 N. Y. S. 2d 230; or the performance on public property ·of a drama or opera based on religious material or carrying a religious message, cf. ·*County of Los Angeles* v. *Hollinger*, 200 Cal. App. 2d 877, 19 Cal.·Rptr. 648.

ing with adults, not with impressionable children as in the public schools. Moreover, the school exercises are not designed to provide the pupils with general opportunities for worship denied them by the legal obligation to attend school. The student's compelled presence in school for five days a week in no way renders the regular religious facilities of the community less accessible to him than they are to others. The situation of the school child is therefore plainly unlike that of the isolated soldier or the prisoner.

The State must be steadfastly neutral in all matters of faith, and neither favor nor inhibit religion. In my view, government cannot sponsor religious exercises in the public schools without jeopardizing that neutrality. On the other hand, hostility, not neutrality, would characterize the refusal to provide chaplains and places of worship for prisoners and soldiers cut off by the State from all civilian opportunities for public communion, the withholding of draft exemptions for ministers and conscientious objectors; or the denial of the temporary use of an empty public building to a congregation whose place of worship has been destroyed by fire or flood. I do not say that government *must* provide chaplains or draft exemptions, or that the courts should intercede if it fails to do so.

B. *Establishment and Exercises in Legislative Bodies.*—The saying of invocational prayers in legislative chambers, state or federal, and the appointment of legislative chaplains, might well represent no involvements of the kind prohibited by the Establishment Clause.[75] Legislators, federal and state, are mature adults who may presumably absent themselves from such public and cere-

---

[75] Compare Moulton and Myers, Report on Appointing Chaplains to the Legislature of New York, in Blau, Cornerstones of Religious Freedom in America (1949), 141–156; Comment, 63 Col. L. Rev. 73, 97 (1963).

monial exercises without incurring any penalty, direct or indirect. It may also be significant that, at least in the case of the Congress, Art. I, § 5, of the Constitution makes each House the monitor of the "Rules of its Proceedings" so that it is at least arguable whether such matters present "political questions" the resolution of which is exclusively confided to Congress. See *Baker* v. *Carr,* 369 U. S. 186, 232. Finally, there is the difficult question of who may be heard to challenge such practices. See *Elliott* v. *White,* 23 F. 2d 997.

C. *Non-Devotional Use of the Bible in the Public Schools.*—The holding of the Court today plainly does not foreclose teaching *about* the Holy Scriptures or about the differences between religious sects in classes in literature or history. Indeed, whether or not the Bible is involved, it would be impossible to teach meaningfully many subjects in the social sciences or the humanities without some mention of religion.[76] To what extent, and at what points in the curriculum, religious materials should be cited are matters which the courts ought to entrust very largely to the experienced officials who superintend our Nation's public schools. They are experts in such matters, and we are not. We should heed Mr. Justice Jackson's caveat that any attempt by this Court to announce curricular standards would be "to decree a uniform, rigid and, if we are consistent, an unchanging standard for countless school boards represent-

---

[76] A comprehensive survey of the problems raised concerning the role of religion in the secular curriculum is contained in Brown, ed., The Study of Religion in the Public Schools: An Appraisal (1958). See also Katz, Religion and American Constitutions, Lecture at Northwestern University Law School, March 21, 1963, pp. 37–41; Educational Policies Comm'n of the National Education Assn., Moral and Spiritual Values in the Public Schools (1951), 49–80. · Compare, for a consideration of similar problems in state-supported colleges and universities, Louisell and Jackson, Religion, Theology, and Public Higher Education, 50 Cal. L. Rev. 751 (1962).

ing and serving highly localized groups which not only differ from each other but which themselves from time to time change attitudes." *Illinois ex rel. McCollum* v. *Board of Education, supra,* at 237.

We do not, however, in my view usurp the jurisdiction of school administrators by holding as we do today that morning devotional exercises in any form are constitutionally invalid. But there is no occasion now to go further and anticipate problems we cannot judge with the material now before us. Any attempt to impose rigid limits upon the mention of God or references to the Bible in the classroom would be fraught with dangers. If it should sometime hereafter be shown that in fact religion can play no part in the teaching of a given subject without resurrecting the ghost of the practices we strike down today, it will then be time enough to consider questions we must now defer.

D. *Uniform Tax Exemptions Incidentally Available to Religious Institutions.*—Nothing we hold today questions the propriety of certain tax deductions or exemptions which incidentally benefit churches and religious institutions, along with many secular charities and nonprofit organizations. If religious institutions benefit, it is in spite of rather than because of their religious character. For religious institutions simply share benefits which government makes generally available to educational, charitable, and eleemosynary groups.[77] There is no indication that taxing authorities have used such benefits in any way to subsidize worship or foster belief in God. And as

---

[77] See generally Torpey, Judicial Doctrines of Religious Rights in America (1948), c. VI; Van Alstyne, Tax Exemption of Church Property, 20 Ohio State L. J. 461 (1959); Sutherland, Due Process and Disestablishment, 62 Harv. L. Rev. 1306, 1336–1338 (1949); Louisell and Jackson, Religion, Theology, and Public Higher Education, 50 Cal. L. Rev. 751, 773–780 (1962); 7 De Paul L. Rev. 206 (1958); 58 Col. L. Rev. 417 (1958); 9 Stan. L. Rev. 366 (1957).

among religious beneficiaries, the tax exemption or deduction can be truly nondiscriminatory, available on equal terms to small as well as large religious bodies, to popular and unpopular sects, and to those organizations which reject as well as those which accept a belief in God.[78]

E. *Religious Considerations in Public Welfare Programs.*—Since government may not support or directly aid religious *activities* without violating the Establishment Clause, there might be some doubt whether nondiscriminatory programs of governmental aid may constitutionally include *individuals* who become eligible wholly or partially for religious reasons. For example, it might be suggested that where a State provides unemployment compensation generally to those who are unable to find suitable work, it may not extend such benefits to persons who are unemployed by reason of religious beliefs or practices without thereby establishing the religion to which those persons belong. Therefore, the argument runs, the State may avoid an establishment only by singling out and excluding such persons on the ground that religious beliefs or practices have made them potential beneficiaries. Such a construction would, it seems to me, require government to impose religious discriminations and disabilities, thereby jeopardizing the free exercise of religion, in order to avoid what is thought to constitute an establishment.

The inescapable flaw in the argument, I suggest, is its quite unrealistic view of the aims of the Establishment Clause. The Framers were not concerned with the effects of certain incidental aids to individual worshippers which come about as by-products of general and nondiscriminatory welfare programs. If such benefits serve to make

[78] See, *e. g., Washington Ethical Society* v. *District of Columbia,* 101 U. S. App. D. C. 371, 249 F. 2d 127; *Fellowship of Humanity* v. *County of Alameda,* 153 Cal. App. 2d 673, 315 P. 2d 394.

easier or less expensive the practice of a particular creed, or of all religions, it can hardly be said that the purpose of the program is in any way religious, or that the consequence of its nondiscriminatory application is to create the forbidden degree of interdependence between secular and sectarian institutions. I cannot therefore accept the suggestion, which seems to me implicit in the argument outlined here, that every judicial or administrative construction which is designed to prevent a public welfare program from abridging the free exercise of religious beliefs, is for that reason *ipso facto* an establishment of religion.

F. *Activities Which, Though Religious in Origin, Have Ceased to Have Religious Meaning.*—As we noted in our *Sunday Law* decisions, nearly every criminal law on the books can be traced to some religious principle or inspiration. But that does not make the present enforcement of the criminal law in any sense an establishment of religion, simply because it accords with widely held religious principles. As we said in *McGowan* v. *Maryland,* 366 U. S. 420, 442, "the 'Establishment' Clause does not ban federal or state regulation of conduct whose reason or effect merely happens to coincide or harmonize with the tenets of some or all religions." This rationale suggests that the use of the motto "In God We Trust" on currency, on documents and public buildings and the like may not offend the clause. It is not that the use of those four words can be dismissed as "de minimis"—for I suspect there would be intense opposition to the abandonment of that motto. The truth is that we have simply interwoven the motto so deeply into the fabric of our civil polity that its present use may well not present that type of involvement which the First Amendment prohibits.

This general principle might also serve to insulate the various patriotic exercises and activities used in the public schools and elsewhere which, whatever may have been

304

their origins, no longer have a religious purpose or meaning. The reference to divinity in the revised pledge of allegiance, for example, may merely recognize the historical fact that our Nation was believed to have been founded "under God." Thus reciting the pledge may be no more of a religious exercise than the reading aloud of Lincoln's Gettysburg Address, which contains an allusion to the same historical fact.

The principles which we reaffirm and apply today can hardly be thought novel or radical. They are, in truth, as old as the Republic itself, and have always been as integral a part of the First Amendment as the very words of that charter of religious liberty. No less applicable today than they were when first pronounced a century ago, one year after the very first court decision involving religious exercises in the public schools, are the words of a distinguished Chief Justice of the Commonwealth of Pennsylvania, Jeremiah S. Black:

> "The manifest object of the men who framed the institutions of this country, was to have a *State without religion,* and a *Church without politics*—that is to say, they meant that one should never be used as an engine for any purpose of the other, and that no man's rights in one should be tested by his opinions about the other. As the Church takes no note of men's political differences, so the State looks with equal eye on all the modes of religious faith. . . . Our fathers seem to have been perfectly sincere in their belief that the members of the Church would be more patriotic, and the citizens of the State more religious, by keeping their respective functions entirely separate." Essay on Religious Liberty, in Black, ed., Essays and Speeches of Jeremiah S. Black (1886), 53.

Mr. Justice Goldberg, with whom Mr. Justice Harlan joins, concurring.

As is apparent from the opinions filed today, delineation of the constitutionally permissible relationship between religion and government is a most difficult and sensitive task, calling for the careful exercise of both judicial and public judgment and restraint. The considerations which lead the Court today to interdict the clearly religious practices presented in these cases are to me wholly compelling; I have no doubt as to the propriety of the decision and therefore join the opinion and judgment of the Court. The singular sensitivity and concern which surround both the legal and practical judgments involved impel me, however, to add a few words in further explication, while at the same time avoiding repetition of the carefully and ably framed examination of history and authority by my Brethren.

The First Amendment's guarantees, as applied to the States through the Fourteenth Amendment, foreclose not only laws "respecting an establishment of religion" but also those "prohibiting the free exercise thereof." These two proscriptions are to be read together, and in light of the single end which they are designed to serve. The basic purpose of the religion clause of the First Amendment is to promote and assure the fullest possible scope of religious liberty and tolerance for all and to nurture the conditions which secure the best hope of attainment of that end.

The fullest realization of true religious liberty requires that government neither engage in nor compel religious practices, that it effect no favoritism among sects or between religion and nonreligion, and that it work deterrence of no religious belief. But devotion even to these simply stated objectives presents no easy course, for the unavoidable accommodations necessary to achieve the

maximum enjoyment of each and all of them are often difficult of discernment. There is for me no simple and clear measure which by precise application can readily and invariably demark the permissible from the impermissible.

It is said, and I agree, that the attitude of government toward religion must be one of neutrality. But untutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that noninterference and noninvolvement with the religious which the Constitution commands, but of a brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious. Such results are not only not compelled by the Constitution, but, it seems to me, are prohibited by it.

Neither government nor this Court can or should ignore the significance of the fact that a vast portion of our people believe in and worship God and that many of our legal, political and personal values derive historically from religious teachings. Government must inevitably take cognizance of the existence of religion and, indeed, under certain circumstances the First Amendment may require that it do so. And it seems clear to me from the opinions in the present and past cases that the Court would recognize the propriety of providing military chaplains and of the teaching *about* religion, as distinguished from the teaching *of* religion, in the public schools. The examples could readily be multiplied, for both the required and the permissible accommodations between state and church frame the relation as one free of hostility or favor and productive of religious and political harmony, but without undue involvement of one in the concerns or practices of the other. To be sure, the judgment in each case is a delicate one, but it must be made if we are to do loyal service as judges to the ultimate First Amendment objective of religious liberty.

The practices here involved do not fall within any sensible or acceptable concept of compelled or permitted accommodation and involve the state so significantly and directly in the realm of the sectarian as to give rise to those very divisive influences and inhibitions of freedom which both religion clauses of the First Amendment preclude. The state has ordained and has utilized its facilities to engage in unmistakably religious exercises—the devotional reading and recitation of the Holy Bible—in a manner having substantial and significant import and impact. That it has selected, rather than written, a particular devotional liturgy seems to me without constitutional import. The pervasive religiosity and direct governmental involvement inhering in the prescription of prayer and Bible reading in the public schools, during and as part of the curricular day, involving young impressionable children whose school attendance is statutorily compelled, and utilizing the prestige, power, and influence of school administration, staff, and authority, cannot realistically be termed simply accommodation, and must fall within the interdiction of the First Amendment. I find nothing in the opinion of the Court which says more than this. And, of course, today's decision does not mean that all incidents of government which import of the religious are therefore and without more banned by the strictures of the Establishment Clause. As the Court declared only last Term in *Engel* v. *Vitale,* 370 U. S. 421, 435, n. 21:

> "There is of course nothing in the decision reached here that is inconsistent with the fact that school children and others are officially encouraged to express love for our country by reciting historical documents such as the Declaration of Independence which contain references to the Deity or by singing officially espoused anthems which include the composer's professions of faith in a Supreme Being, or

"with the fact that there are many manifestations in our public life of belief in God. Such patriotic or ceremonial occasions bear no true resemblance to the unquestioned religious exercise that the State . . . has sponsored in this instance."

The First Amendment does not prohibit practices which by any realistic measure create none of the dangers which it is designed to prevent and which do not so directly or substantially involve the state in religious exercises or in the favoring of religion as to have meaningful and practical impact. It is of course true that great consequences can grow from small beginnings, but the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow.

MR. JUSTICE STEWART, dissenting.

I think the records in the two cases before us are so fundamentally deficient as to make impossible an informed or responsible determination of the constitutional issues presented. Specifically, I cannot agree that on these records we can say that the Establishment Clause has necessarily been violated.[1] But I think there exist serious questions under both that provision and the Free Exercise Clause—insofar as each is imbedded in the Fourteenth Amendment—which require the remand of these cases for the taking of additional evidence.

## I.

The First Amendment declares that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." It is, I

---

[1] It is instructive, in this connection, to examine the complaints in the two cases before us. Neither complaint attacks the challenged practices as "establishments." What both allege as the basis for their causes of actions are, rather, violations of religious liberty.

think, a fallacious oversimplification to regard these two provisions as establishing a single constitutional standard of "separation of church and state," which can be mechanically applied in every case to delineate the required boundaries between government and religion. We err in the first place if we do not recognize, as a matter of history and as a matter of the imperatives of our free society, that religion and government must necessarily interact in countless ways. Secondly, the fact is that while in many contexts the Establishment Clause and the Free Exercise Clause fully complement each other, there are areas in which a doctrinaire reading of the Establishment Clause leads to irreconcilable conflict with the Free Exercise Clause.

A single obvious example should suffice to make the point. Spending federal funds to employ chaplains for the armed forces might be said to violate the Establishment Clause. Yet a lonely soldier stationed at some faraway outpost could surely complain that a government which did *not* provide him the opportunity for pastoral guidance was affirmatively prohibiting the free exercise of his religion. And such examples could readily be multiplied. The short of the matter is simply that the two relevant clauses of the First Amendment cannot accurately be reflected in a sterile metaphor which by its very nature may distort rather than illumine the problems involved in a particular case. Cf. *Sherbert* v. *Verner, post,* p. 398.

## II.

As a matter of history, the First Amendment was adopted solely as a limitation upon the newly created National Government. The events leading to its adoption strongly suggest that the Establishment Clause was primarily an attempt to insure that Congress not only would be powerless to establish a national church, but

would also be unable to interfere with existing state establishments.  See *McGowan* v. *Maryland,* 366 U. S. 420, 440–441.  Each State was left free to go its own way and pursue its own policy with respect to religion.  Thus Virginia from the beginning pursued a policy of disestablishmentarianism.  Massachusetts, by contrast, had an established church until well into the nineteenth century.

So matters stood until the adoption of the Fourteenth Amendment, or more accurately, until this Court's decision in *Cantwell* v. *Connecticut,* in 1940.  310 U. S. 296. In that case the Court said: "The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof.  The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws." [2]

I accept without question that the liberty guaranteed by the Fourteenth Amendment against impairment by the States embraces in full the right of free exercise of religion protected by the First Amendment, and I yield to no one in my conception of the breadth of that freedom. See *Braunfeld* v. *Brown,* 366 U. S. 599, 616 (dissenting opinion).  I accept too the proposition that the Fourteenth Amendment has somehow absorbed the Establishment Clause, although it is not without irony that a constitutional provision evidently designed to leave the States free to go their own way should now have become a restriction upon their autonomy.  But I cannot agree with what seems to me the insensitive definition of the Establishment Clause contained in the Court's opinion, nor with the different but, I think, equally mechanistic definitions contained in the separate opinions which have been filed.

---

[2] 310 U. S., at 303.  The Court's statement as to the Establishment Clause in *Cantwell* was dictum.  The case was decided on free exercise grounds.

### III.

Since the *Cantwell* pronouncement in 1940, this Court has only twice held invalid state laws on the ground that they were laws "respecting an establishment of religion" in violation of the Fourteenth Amendment. *McCollum* v. *Board of Education,* 333 U. S. 203; *Engel* v. *Vitale,* 370 U. S. 421. On the other hand, the Court has upheld against such a challenge laws establishing Sunday as a compulsory day of rest, *McGowan* v. *Maryland,* 366 U. S. 420, and a law authorizing reimbursement from public funds for the transportation of parochial school pupils. *Everson* v. *Board of Education,* 330 U. S. 1.

Unlike other First Amendment guarantees, there is an inherent limitation upon the applicability of the Establishment Clause's ban on state support to religion. That limitation was succinctly put in *Everson* v. *Board of Education,* 330 U. S. 1, 18: "State power is no more to be used so as to handicap religions than it is to favor them." [3] And in a later case, this Court recognized that the limitation was one which was itself compelled by the free exercise guarantee. "To hold that a state cannot consistently with the First and Fourteenth Amendments utilize its public school system to aid any or all religious faiths or sects in the dissemination of their doctrines and ideals does not . . . manifest a governmental hostility to religion or religious teachings. A manifestation of such hostility would be at war with our national tradition as embodied in the First Amendment's guaranty of the free

---

[3] See also, in this connection, *Zorach* v. *Clauson,* 343 U. S. 306, 314: "Government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person. But we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence."

exercise of religion." . *McCollum* v. *Board of Education,* 333 U. S. 203, 211–212.

That the central value embodied in the First Amendment—and, more particularly, in the guarantee of "liberty" contained in the Fourteenth—is the safeguarding of an individual's right to free exercise of his religion has been consistently recognized. Thus, in the case of *Hamilton* v. *Regents,* 293 U. S. 245, 265, Mr. Justice Cardozo, concurring, assumed that it was ". . . *the religious liberty* protected by the First Amendment against invasion by the nation [which] is protected by the Fourteenth Amendment against invasion by the states." (Emphasis added.) And in *Cantwell* v. *Connecticut, supra,* the purpose of those guarantees was described in the following terms: "On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion." 310 U. S., at 303.

It is this concept of constitutional protection embodied in our decisions which makes the cases before us such difficult ones for me. For there is involved in these cases a substantial free exercise claim on the part of those who affirmatively desire to have their children's school day open with the reading of passages from the Bible.

It has become accepted that the decision in *Pierce* v. *Society of Sisters,* 268 U. S. 510, upholding the right of parents to send their children to nonpublic schools, was ultimately based upon the recognition of the validity of the free exercise claim involved in that situation. It might be argued here that parents who wanted their children to be exposed to religious influences in school could, under *Pierce,* send their children to private or parochial

schools. But the consideration which renders this contention too facile to be determinative has already been recognized by the Court: "Freedom of speech, freedom of the press, freedom of religion are available to all, not merely to those who can pay their own way." *Murdock* v. *Pennsylvania*, 319 U. S. 105, 111.

It might also be argued that parents who want their children exposed to religious influences can adequately fulfill that wish off school property and outside school time. With all its surface persuasiveness, however, this argument seriously misconceives the basic constitutional justification for permitting the exercises at issue in these cases. For a compulsory state educational system so structures a child's life that if religious exercises are held to be an impermissible activity in schools, religion is placed at an artificial and state-created disadvantage. Viewed in this light, permission of such exercises for those who want them is necessary if the schools are truly to be neutral in the matter of religion. And a refusal to permit religious exercises thus is seen, not as the realization of state neutrality, but rather as the establishment of a religion of secularism, or at the least, as government support of the beliefs of those who think that religious exercises should be conducted only in private.

What seems to me to be of paramount importance, then, is recognition of the fact that the claim advanced here in favor of Bible reading is sufficiently substantial to make simple reference to the constitutional phrase "establishment of religion" as inadequate an analysis of the cases before us as the ritualistic invocation of the nonconstitutional phrase "separation of church and state." What these cases compel, rather, is an analysis of just what the "neutrality" is which is required by the interplay of the Establishment and Free Exercise Clauses of the First Amendment, as imbedded in the Fourteenth.

314

## IV.

Our decisions make clear that there is no constitutional bar to the use of government property for religious purposes. On the contrary, this Court has consistently held that the discriminatory barring of religious groups from public property is itself a violation of First and Fourteenth Amendment guarantees. *Fowler* v. *Rhode Island,* 345 U. S. 67; *Niemotko* v. *Maryland,* 340 U. S. 268. A different standard has been applied to public school property, because of the coercive effect which the use by religious sects of a compulsory school system would necessarily have upon the children involved. *McCollum* v. *Board of Education,* 333 U. S. 203. But insofar as the *McCollum* decision rests on the Establishment rather than the Free Exercise Clause, it is clear that its effect is limited to religious instruction—to government support of proselytizing activities of religious sects by throwing the weight of secular authority behind the dissemination of religious tenets.[4]

The dangers both to government and to religion inherent in official support of instruction in the tenets of various religious sects are absent in the present cases, which involve only a reading from the Bible unaccompanied by comments which might otherwise constitute instruction. Indeed, since, from all that appears in either record, any teacher who does not wish to do so is free not to participate,[5] it cannot even be contended that some

---

[4] "This is beyond all question a utilization of the tax-established and tax-supported public school system to aid religious groups *to spread their faith.*" *McCollum* v. *Board of Education,* 333 U. S. 203, 210. (Emphasis added.)

[5] The Pennsylvania statute was specifically amended to move the compulsion upon teachers. Act of December 17, 1959, P. L. 1928, 24 Purdon's Pa. Stat. Ann. § 15–1516. Since the Maryland case is

infinitesimal part of the salaries paid by the State are made contingent upon the performance of a religious function.

In the absence of evidence that the legislature or school board intended to prohibit local schools from substituting a different set of readings where parents requested such a change, we should not assume that the provisions before us—as actually administered—may not be construed simply as authorizing religious exercises, nor that the designations may not be treated simply as indications of the promulgating body's view as to the community's preference. We are under a duty to interpret these provisions so as to render them constitutional if reasonably possible. Compare *Two Guys* v. *McGinley,* 366 U. S. 582, 592–595; *Everson* v. *Board of Education,* 330 U. S. 1, 4, and n. 2. In the *Schempp* case there is evidence which indicates that variations were in fact permitted by the very school there involved, and that further variations were not introduced only because of the absence of requests from parents. And in the *Murray* case the Baltimore rule itself contains a provision permitting another version of the Bible to be substituted for the King James version.

If the provisions are not so construed, I think that their validity under the Establishment Clause would be extremely doubtful, because of the designation of a particular religious book and a denominational prayer. But since, even if the provisions are construed as I believe they must be, I think that the cases before us must be remanded for further evidence on other issues—thus affording the plaintiffs an opportunity to prove that local variations are not in fact permitted—I shall for the bal-

---

here on a demurrer, the issue of whether or not a teacher could be dismissed for refusal to participate seems, among many others, never to have been raised.

ance of this dissenting opinion treat the provisions before us as making the variety and content of the exercises, as well as a choice as to their implementation, matters which ultimately reflect the consensus of each local school community. In the absence of coercion upon those who do not wish to participate—because they hold less strong beliefs, other beliefs, or no beliefs at all—such provisions cannot, in my view, be held to represent the type of support of religion barred by the Establishment Clause. For the only support which such rules provide for religion is the withholding of state hostility—a simple acknowledgment on the part of secular authorities that the Constitution does not require extirpation of all expression of religious belief.

## V.

I have said that these provisions authorizing religious exercises are properly to be regarded as measures making possible the free exercise of religion. But it is important to stress that, strictly speaking, what is at issue here is a privilege rather than a right. In other words, the question presented is not whether exercises such as those at issue here are constitutionally compelled, but rather whether they are constitutionally invalid. And that issue, in my view, turns on the question of coercion.

It is clear that the dangers of coercion involved in the holding of religious exercises in a schoolroom differ qualitatively from those presented by the use of similar exercises or affirmations in ceremonies attended by adults. Even as to children, however, the duty laid upon government in connection with religious exercises in the public schools is that of refraining from so structuring the school environment as to put any kind of pressure on a child to participate in those exercises; it is not that of providing an atmosphere in which children are kept scrupulously insulated from any awareness that some of their fellows

may want to open the school day with prayer, or of the fact that there exist in our pluralistic society differences of religious belief.

These are not, it must be stressed, cases like *Brown* v. *Board of Education,* 347 U. S. 483, in which this Court held that, in the sphere of public education, the Fourteenth Amendment's guarantee of equal protection of the laws required that race not be treated as a relevant factor. A segregated school system is not invalid because its operation is coercive; it is invalid simply because our Constitution presupposes that men are created equal, and that therefore racial differences cannot provide a valid basis for governmental action. Accommodation of religious differences on the part of the State, however, is not only permitted but required by that same Constitution.

The governmental neutrality which the First and Fourteenth Amendments require in the cases before us, in other words, is the extension of evenhanded treatment to all who believe, doubt, or disbelieve—a refusal on the part of the State to weight the scales of private choice. In these cases, therefore, what is involved is not state action based on impermissible categories, but rather an attempt by the State to accommodate those differences which the existence in our society of a variety of religious beliefs makes inevitable. The Constitution requires that such efforts be struck down only if they are proven to entail the use of the secular authority of government to coerce a preference among such beliefs.

It may well be, as has been argued to us, that even the supposed benefits to be derived from noncoercive religious exercises in public schools are incommensurate with the administrative problems which they would create. The choice involved, however, is one for each local community and its school board, and not for this Court. For, as I have said, religious exercises are not constitutionally invalid if they simply reflect differences which exist in the

society from which the school draws its pupils. They become constitutionally invalid only if their administration places the sanction of secular authority behind one or more particular religious or irreligious beliefs.

To be specific, it seems to me clear that certain types of exercises would present situations in which no possibility of coercion on the part of secular officials could be claimed to exist. Thus, if such exercises were held either before or after the official school day, or if the school schedule were such that participation were merely one among a number of desirable alternatives,[6] it could hardly be contended that the exercises did anything more than to provide an opportunity for the voluntary expression of religious belief. On the other hand, a law which provided for religious exercises during the school day and which contained no excusal provision would obviously be unconstitutionally coercive upon those who did not wish to participate. And even under a law containing an excusal provision, if the exercises were held during the school day, and no equally desirable alternative were provided by the school authorities, the likelihood that children might be under at least some psychological compulsion to participate would be great. In a case such as the latter, however, I think we would err if we *assumed* such coercion in the absence of any evidence.[7]

---

[6] See, *e. g.*, the description of a plan permitting religious instruction off school property contained in *McCollum* v. *Board of Education*, 333 U. S. 203, 224 (separate opinion of Mr. Justice Frankfurter).

[7] Cf. "The task of separating the secular from the religious in education is one of magnitude, intricacy and delicacy. To lay down a sweeping constitutional doctrine as demanded by complainant and apparently approved by the Court, applicable alike to all school boards of the nation, . . . is to decree a uniform, rigid and, if we are consistent, an unchanging standard for countless school boards representing and serving highly localized groups which not only differ from each other but which themselves from time to time change attitudes. It seems to me that to do so is to allow zeal for our own

## VI.

Viewed in this light, it seems to me clear that the records in both of the cases before us are wholly inadequate to support an informed or responsible decision. Both cases involve provisions which explicitly permit any student who wishes, to be excused from participation in the exercises. There is no evidence in either case as to whether there would exist any coercion of any kind upon a student who did not want to participate. No evidence at all was adduced in the *Murray* case, because it was decided upon a demurrer. All that we have in that case, therefore, is the conclusory language of a pleading. While such conclusory allegations are acceptable for procedural purposes, I think that the nature of the constitutional problem involved here clearly demands that no decision be made except upon evidence. In the *Schempp* case the record shows no more than a subjective prophecy by a parent of what he thought would happen if a request were made to be excused from participation in the exercises under the amended statute. No such request was ever made, and there is no evidence whatever as to what might or would actually happen, nor of what administrative arrangements the school actually might or could make to free from pressure of any kind those who do not want to participate in the exercises. There were no District Court findings on this issue, since the case under the amended statute was decided exclusively on Establishment Clause grounds. 201 F. Supp. 815.

What our Constitution indispensably protects is the freedom of each of us, be he Jew or Agnostic, Christian or

---

ideas of what is good in public instruction to induce us to accept the role of a super board of education for every school district in the nation." *McCollum* v. *Board of Education.* 333 U S 203, 237 (concurring opinion of Mr. Justice Jackson).

Atheist, Buddhist or Freethinker, to believe or disbelieve, to worship or not worship, to pray or keep silent, according to his own conscience, uncoerced and unrestrained by government. It is conceivable that these school boards, or even all school boards, might eventually find it impossible to administer a system of religious exercises during school hours in such a way as to meet this constitutional standard—in such a way as completely to free from any kind of official coercion those who do not affirmatively want to participate.[8] But I think we must not assume that school boards so lack the qualities of inventiveness and good will as to make impossible the achievement of that goal.

I would remand both cases for further hearings.

---

[8] For example, if the record in the *Schempp* case contained proof (rather than mere prophecy) that the timing of morning announcements by the school was such as to handicap children who did not want to listen to the Bible reading, or that the excusal provision was so administered as to carry any overtones of social inferiority, then impermissible coercion would clearly exist.